DECISION
Plaintiff appeals the Yamhill County Board of Property Tax Appeals Order, dated March 18, 2009, reducing the 2008-09 real market value of land identified as Account 66895 (subject property; also referred to as Lot 2). A trial was held before Magistrate Jeffrey S. Mattson in the Oregon Tax Courtroom on August 26, 2010. Jodi Bradley (Bradley), Appraiser II, Yamhill County Assessment and Taxation, and Oregon certified appraiser, and Ron Graper (Graper), Chief Appraiser, Yamhill County Assment and Taxation, appeared and testified on behalf of Plaintiff. Brett Veatch (Veatch), Real Estate Broker, appeared and testified on behalf of Defendants. Wayne M. Richards (Richards), MAI, SRA, testified on behalf of Defendants.
Plaintiffs Exhibits 1 through 9, 11, and 12 were admitted without objection. Defendants' Exhibits A through PP were admitted without objection. Defendants submitted Exhibits QQ through WW as rebuttal evidence.
Plaintiff appealed the Yamhill County Board of Property Tax Appeals Orders, dated March 18, 2009, reducing the 2008-09 real market value of 37 parcels owned by Defendants. Those appeals are TC-MD No 090691B through TC-MD No 090727B and were heard together *Page 2 
at the above referenced trial. The court's decisions for the other 36 appeals are identical to this Decision except for the account and lot number.
 I. STATEMENT OF FACTS
In her opening argument, Bradley stated that the Yamhill County Board of Property Tax Appeals Order was filed in "error" and was "not supported by the evidence." She opened her testimony stating that the subject property is located in the Ra'Nor Estates subdivision that was developed by Ralph Johnson (Johnson). Johnson filed a Measure 37 application that was approved by the Yamhill County Department of Planning and Development on February 24, 2005, and subsequently amended "to correct the scrivener's error." (Ptf's Exs 1; 2.) The Yamhill County Department of Planning and Development Board Order 05-535 stated that Johnson was "authorized to make application to divide the subject property into one acre lots and build a single family dwelling on each undeveloped lot, a use permitted on the subject property at the time claimant acquired the property." (Ptf's Ex 2 at 2.) Bradley testified Johnson subsequently filed an application for subdivision, RaNor Estates, that was approved in August 2007. (Ptf's Ex 3.) She testified that, in October 2007, building permits were approved for 40 lots. (Ptf's Ex 4.) Bradley testified that, in December 2007, the county issued four single family certificates of occupancy after the effective date of Measure 49. (Ptf's Ex 5.) Each certificate stated that "at the time of issuance, this structure was in compliance with the various ordinances of the county regulating the building construction or use." (Id.) *Page 3 
Veatch testified that, on December 6, 2007, Measure 49 went into effect. (Defs' Hearing Brief Submission of Exhibits For Entry Into The Record (Hearing Brief) at 3.) He testified that:
 "On December 19th, 2007, the Yamhill County Board of Commissioners held a formal hearing to consider and take testimony on proposed Ordinance No. 823 which would establish a process to determine whether an applicant has a common law vested right to complete and continue a use allowed by a Board-issued Measure 37 waiver. The Board subsequently adopted the Ordinance No. 823 which was to take effect on December 21st, 2007. * * * On December 21st, 2007, Defendant submitted an application for a Final County Vesting Decision to Yamhill County. Yamhill County Ordinance No. 823 took effect."
(Id.)
Bradley testified that the subject property and other properties were listed for sale by Copper Gold Real Estate in September 2007. (Ptf's Ex 6.) She testified that the listing prices ranged from $149,900 to $369,900. Bradley testified that, in October 2007, four lots sold and received final inspection. The lots were transferred on November 26, 2007. (Ptf's Ex 7.) She testified that Lot 21 sold for $100,000, Lot 22 sold for $112,500, and Lots 20 and 24 sold for $250,000. Bradley testified that those sale prices were the "least monetary compensation that the seller would accept and the lots were sold to "generate capital for the developer." Veatch wrote that "all these four sales demonstrate is value the market would bear in the uncertain months prior to the passage of Measure 49 — prior to it's debilitating effects — for deeds that were transferred under special, non-repeatable circumstances." (Def's Rebuttal Evid at 4. (Emphasis in original.))
Bradley testified that, as of January 1, 2008, one-acre lots in the same subdivision as the subject property were advertised for sale on a website. (Ptf's Ex 8.) Bradley testified that the listing prices ranged from $234,900 to $699,900, and according to the listing "two properties had sold and four sales were pending." (Id. at 4, 5.) Bradley testified that Lots 20 and 21 included *Page 4 
"replacement dwelling permits in their price structure." (Id. at 5.) Veatch testified that there has been no "interest and no sales since January 2008." He commented that "[a]dvertised pricing has never been an indication of value — what a buyer would actually pay for a property." (Def's Rebuttal Evid at 4.)
Bradley testified that she prepared a Comparable Sales Analysis. (Ptf's Ex 9.) She explained that the four comparable properties that sold between January 2007 and May 2010 are located between 3.57 miles and 8.4 miles from the subject property. (Id.) Bradley testified that she adjusted the sale price for date of sale, size, view, on-site development, and improvements. (Id.) She testified that she confirmed each sale. Based on the four adjusted sale prices, Bradley concluded the "the county's opinion of value is $164,400." (Id.) That value is almost the same as the adjusted value of comparable 3 which is "most comparable to subject with the least amount of adjustments and closer in size." (Id.) Using the $164,400 opinion of value, Plaintiff computed a value for each of the 37 lots that were appealed. (Ptf's Ex 11.)
Veatch stated that:
 "[t]here exist no comparable sales to the Parcels which reflect an arm's-length transaction; which are involved in a protracted vesting process; and which are awaiting an unknown outcome while staggering under the weight of heavy restrictions. When speaking of properties created under Measure 37 waivers yet `unvested', there does however exist an acute demarcation between the rights in, benefits from and value of a property before the effective date of Measure 49 (December 5th, 2007) when compared to those rights, benefits and the value existing after that date. It is this distinction that which prevents sales that took place before the effective date of Measure 49 (December 5th, 2007) from being compared with any unvested Measure 37 properties on any date thereafter."
(Defs' Hearing Brief at 11,12.) Veatch suggested that, in assessing the subject property, Plaintiff failed to follow "the requirements of ORS 308.205(2)(d) * * * which states: ["If the property is subject togovernment restriction as to use on the assessment date under applicable law or regulation, real market value shall not be based upon sales that reflect for the property a *Page 5 
value that the property would have if the use of the property were not subject to the restriction unless adjustments in value are madereflecting the effect of the restrictions"] (emphasis added)." (Def's Hearing Brief at 6. (Emphasis in original.))
In response to Veatch's questions, Bradley testified that, in making the value determination, she concluded that there were no "clouds" on Defendants' title, there should be no adjustment for the county's temporary building moratorium, there were no other governmental restrictions on the subject property as of January 1, 2008, and the subject property was "buildable." Bradley concluded that the land was "transferable with limitations." She testified that Defendants could not "modify building permits."
The parties dispute whether there was a "legal" building moratorium in Yamhill County. Defendants allege that there was no public hearing as "required by ORS 197.520" but there was a "governmental restriction" on the subject property "without the consent of Defendants." (See Defs' Ex L at 1.) In support of his conclusion that no building moratorium was in place for the subject property, Veatch submitted an email from Mike Brandt (Brandt), a county planning department employee, responding to an email inquiry dated September 9, 2010. Brandt stated:
 "There is a moratorium for properties within the Cove Orchard Sewer District because of limitations with the capacity of the sewer/septic system. Otherwise, I am not aware of any other building moratorium in the County. mb"
(Defs' Ex QQ.) Veatch cited ORS 197.505, concluding that Yamhill County did "none of the items required to enact or continue a moratorium. * * * [E]ven if it had attempted to do so, it would not have succeeded — (a) existing ordinances and applicable law already existed (Measure 49 and Yamhill County Ordinance 823) and (b) no time schedule is capable of being developed due to the litigious nature of Measure 49 and the uncertain time frames associated with claims processes, trials and appeals." (Def's Rebuttal Evid at 2.) Plaintiff citedBaber v. Curry County Assessor (TC-MD No 020215A) (Dec 2002)) and stated that even if a building *Page 6 
moratorium is in place "it does not" necessarily "reduce a property's value." In response, Veatch commented that the Baber court agreed that the "moratorium likely had some effect on value, but [the property owner] failed to provide any evidence or theory to support that decline in value." (Def's Rebuttal Evid at 2.)
Richards disputed Plaintiff's attempt "to equate the prohibition on the issuance of building permits to a moratorium," stating:
 "This is vastly different than the limitations imposed by law involving the legal issues of `vested rights' arising from measure 49. Both of these conditions are a form of `detrimental condition.' * * *
 "Detrimental conditions in most cases result in either a temporary or permanent diminution in value.
 * * * * *
 The impact of a `temporary condition' is a mild to moderate initial diminution in value. As the correction of the problem progresses the negative effect on value will diminish eventually returning to its pre-event condition.
 "* * * A forced event, i.e., government regulation, deed restriction, etc., on the classification chart for Detrimental Conditions is an "Imposed Condition." The following described the `four states of recovery' from a `imposed' detrimental condition.
 "1. A specific problem (event) has been identified.
 "2. A specific solution has not been identified and is a matter of the legal process.
 "3. A specific time frame for resolution cannot be identified and is a matter of the legal process.
 "4. A specific outcome is unknown and could be either positive or negative and is a matter of the legal process.
 "* * * * *
 "The impact by an `imposed condition' is an extreme diminution in value."
(Def's Ex RR at 1, 2.) Richards further stated: "The position demonstrated in the appraisal *Page 7 
report is: the effect on value is the result of a forced event and is similar to the distinction between a buildable and a non-buildable parcel." (Id. at 2.)
Veatch testified that the subject property was subject to Measure 49 and "until the vesting decision was finalized and unappealed" title to the subject property was not "clear." He concluded that "title could be transferred" but with "a cloud." Veatch testified that Measure 49 created a "restriction on use." He concluded that the "government restriction * * * was involuntary on the part of Defendant Taxpayer [and] [t]he outcome of the imposed retrictions is unpredictable and the time frame is unknown." (Def's Rebuttal Evid at 6.)
Richards' testimony was a summary of his appraisal report. (Defs' Ex A.) He testified that his "focus" was on a single 1.33 acre lot.[1] Richards testified that, if that lot had "clear marketable title," the real market value would be $265,000. After Measure 49 was passed, that lot "had clouded title," resulting in a real market value of $13,200. (Defs' Ex A at 44.) Richards subsequently adjusted the real market value to $14,000. (Defs' Ex RR at 11.) Richards testified Measure 49 created "three specific issues": a legal challenge to "vested rights;" title companies "would not provide clear title — would not insure for this issue — and the "exception would not be cleared until the vesting issue was resolved;" and building or new home permits" were no "longer being issued."
Richards testified that, as of January 1, 2008, it "was anybody's guess" as to the value of the subject property. He testified that there was no "buyer interest" and, as of January 1, 2008, "the status was in limbo." Richards testified that his valuation considered each of the issues. He testified that, even though the "lots [are] still saleable," the question was "at what price?" Graper asked Richards about the sales, specifically the "nonbuildable lots" he selected as comparable, *Page 8 
and when the "clouded" title was evident. (See Defs' Ex A at 32, 33, 39.) Graper's rebuttal testimony focused on a critique of Richards' comparable sales, noting the lack of time trend for the sale prices, lack of recognition of subsequent sale of the same property, "distressed" sellers, plottage, and other "troubling" aspects of the selected sales. (Ptf's Ex 12.) Richards responded to Graper's rebuttal testimony, revising his appraisal analysis, addressing "in detail each of the points made by Plaintiff Yamhill County Assessor and arrive[d] at a recalculated valuation summary for the Parcels." (Def's Rebuttal Evid at 3; Def's Exhibit RR.)
Richards testified that he thinks it will "take five years to resolve" the vesting issue. He testified that the "cloud descended," reducing the real market value of the subject property, on December 6, 2007, when Measure 49 was passed. Defendants' requested real market "clouded title" value for the appealed properties was discussed. (Def's Ex RR at 49.)
 II. ANALYSIS
The issue before the court is the 2008-09 real market value of Defendant's property. "Real market value is the standard used throughout the ad valorem statutes except for special assessments."Richardson v. Clackamas County Assessor, TC-MD No 020869D, WL 21263620, at *2 (Mar 26, 2003) (citing Gangle v. Dept. ofRev., 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), [2] which reads:
 "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."
A. Approaches of Valuation — Real Market Value
There are three approaches of valuation (cost, income, and comparable sales) that must be considered in determining the real market value of a property even if one of the approaches is *Page 9 
found to not be applicable. See ORS 308.205(2); OAR 150-308.205-(A)(2). Neither party discussed the applicability of the cost or income approach.
In a case such as the one before the court, the comparable sales approach "may be used to value improved properties, vacant land, or land being considered as though vacant." Chambers Management Corp andMcKenzie River Motors v. Lane County Assessor, TC-MD-No 060354D at 6 (Apr 3, 2007), citing Appraisal Institute, The Appraisalof Real Estate 335 (12th ed 2001). Plaintiff relied on the comparable sales approach. Bradley selected four properties and adjusted each sale price for time, size, location, view, on-site development, and structure. She inspected each property and confirmed that the sale was arm's length. (Ptf's Ex 9.) Based on the four adjusted sale prices, Bradley testified that "the county's opinion of value is $164,400." (Id. at 1.) That value is almost the same as the adjusted value of comparable 3 which is "most comparable to subject with the least amount of adjustments and closer in size." (Id.).
In response, Defendant concluded:
 "[T]he "Direct Sales Comparison Approach is not considered to be practical methodology in the value of land with a `clouded' title. Essentially there are no sales of this property type to be found in the open market to analyze."
(Def's Ex RR at 8.)
There is overwhelming evidence that, as of the assessment date, Measure 49 could affect a use that was not fully-developed under Measure 37. The parties discussed and submitted evidence showing that the subject property is located in a subdivision owned by Defendant who was granted "a Measure 37 waiver * * * allowing Defendant to develop approximately fifty acres Defendant owns near Newberg, Oregon under Board Orders 05-535 and 05-590." (Def's Hearing Brief at 2.) According to Veatch, there have been no subsequent sales of lots in the subdivision where the subject property is located since the enactment of Measure 49. There was no evidence to the contrary. Veatch alleges that the lack of sales is directly tied to Measure 49. *Page 10 
Bradley testified that Measure 49 had no effect on the subject property's real market value.
Legal uncertainties or other factors have resulted in neither party submitting any evidence, in this case, of open-market sales of properties with similar Measure 37 waiver issues like the subject property. Plaintiff has the burden of proof. ORS 308.205(2) provides in pertinent part that "[r]eal market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue." The Department of Revenue adopted OAR 150-308.205-(A)(2)(c), stating that:
 "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions."
Plaintiff's comparable market approach did not state whether the comparable properties like the subject property were authorized by waivers of land use regulations, commonly referred to as a Measure 37 waiver. There is no verifiable evidence using one of the statutory valuation approaches, specifically the comparable sales approach selected by Plaintiff, for the court to consider in determining whether or not Measure 49 negatively impacted the subject property's real market value. Plaintiff failed to carry its burden of proof.
B. Highest and Best Use
The subject property is land. Land valuation is directly related to highest and best use analysis. Appraisal Institute, The Appraisal ofReal Estate 361 (13th ed. 2008). Highest and best use is defined[3]
as: *Page 11 
 "[t]he reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value."
Id. at 277-278. A highest and best use analysis assists the appraiser to "interpret the market forces that affect the subject property and [identify] the use or uses on which the final opinion of value" should be based. Id. at 139. "An appraiser determines the highest and best use of property by weighing market demand for the uses, products or services the property is designed to provide. That analysis focuses on the uses to which a property can most profitably be put."STC Submarine, Inc. v. Dept. of Rev., 13 OTR 14, 18 (1994).
Bradley did not specifically address the subject property's highest and best use. Richards wrote:
 "This appraisal employs an inferred market analysis, not a fundamental analysis to determine a highest and best use for the subject. * * * An inferred analysis is based on local trends and patterns from which inferences are made."
(Def's Ex A at 28.) Bradley's and Richards' comparable sales approaches support the conclusion that the subject property's highest and best use as improved is residential. Richards concluded that "[s]ales, listings, marketing intervals, vacancy rates, rental rates, and/or price change for other similar buildings infer there is adequate demand for the subject building(s) at a price level congruent with this data." (Id.)
In determining whether the subject property's highest and best use is its current use, the first considerations are the tests of physical possibility and legal permissibility. Both parties agree that "underground utilities; drainage; ditching; and other similar requirements" were completed and there are no topographical or other significant natural obstacles preventing residential development. (Defs' Hearing Brief at 2.) The subject property's proposed use is *Page 12 
physically possible. At issue is the legal permissibility of Defendant's continued "use allowed by a Board-issued Measure 37 waiver" of land use restrictions. (Id. at 3.) Richards noted that "[a] number of aspects influence a property's Highest and Best Use including yet not limited to zoning, nearby land uses, physical constraints, supply and demand, as well as general economic conditions." (Def's Ex A at 28.) There is no evidence that the subject property's proposed use is legally permissible without knowing the outcome of the common law vesting process.
There is limited discussion by Richards and none by Bradley of the subject property's highest and best use as vacant, which is the current status of the subject property. Prior to Defendant requesting a zone change to plat and sell rural residential one-acre minimum parcels, the subject property was classified for agricultural use. (Defs' Hearing Brief at 1.) Richards states that the highest and best use of the subject property is "agricultural land" as vacant and improved unless the "Measure 37 `waiver'" is upheld. (Id.) The Measure 37 waiver issue allowing development of the property and the common law vesting process are currently before Oregon trial and appellate courts. As of the assessment date, there was no evidence that the proposed use was viable. More important, there is no evidence that an agricultural use does not represent the subject property's highest present value, given the controversy surrounding the common law vesting process. There is no consideration of the cost to demolish or remodel the existing improvements, including the infrastructure. No one presented an economic study, weighing various economic factors and relating those factors to the subject property. In sum, there is no evidence before the court to determine whether the highest and best use vacant or improved as agricultural land results in the subject property's highest present value as of the date of assessment. *Page 13 
"In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief." ORS 305.427. Plaintiff must establish its claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." Schaefer v. Dept. of Rev., TC No 4530 at 4 (July 12, 2001) (citing Feves v. Dept. of Rev.,4 OTR 302 (1971)). Even though Defendant's evidence does not adequately address the highest and best use concern raised by the court, Plaintiff has the burden of proof. Plaintiff submitted no evidence. Plaintiff failed to carry its burden of proof.
Even though Plaintiff failed to carry its burden of proof and the "burden of going forward with the evidence" has not shifted, the court has jurisdiction to determine the "real market value or correct valuation on the basis of the evidence pleaded by the parties". ORS 305.427; ORS 305.412. For Defendants, Richards presented an appraisal study, relying on a comparative sales approach that compared the "percentage difference between the mean value of buildable and non-buildable land" and included "an additional negative adjustment reflecting the level of risk attributable to a `clouded' title." (Def's Ex RR at 9.) Richards' "inferred market analysis" did not include a "fundamental analysis to determine a highest and best use for the subject." (Defs' Ex A at 28.) Without a complete highest and best use study, the court does not know if the real market value of the subject property's highest and best agricultural use as vacant or improved is more or less than the subject property's highest and best disputed Measure 37 `waiver' use as improved. The court lacks sufficient evidence to make its own determination of real market value. *Page 14 
 III. CONCLUSION
After careful consideration of the testimony and evidence, the court concludes that Plaintiff failed to carry its burden of proof. Now, therefore,
IT IS THE DECISION OF THIS COURT that Plaintiffs appeal is denied.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to:Fourth Floor, 1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the date ofthe Decision or this Decision becomes final and cannot be changed.
 This document was signed by Presiding Magistrate Jill A. Tanneron March 14, 2011. The Court filed and entered this documenton March 14, 2011.
[1] The "focus" lot was Lot 13/Tax Lot R3301-614 which one of the appealed tax lots.
[2] References to the Oregon Revised Statutes (ORS) are to year 2007.
[3] Oregon Administrative Rule 150-308.205-(A)(1) entitled Real Property Valuation for Tax Purposes states that:
 "(e) `Highest and best use' means the reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible, and that results in the highest value. See The Appraisal of Real Estate, 12th edition (2001)." *Page 1