IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

LANE COUNTY ASSESSOR, )
)
        Plaintiff, )  TC-MD 100252C
)
  v. )
)
THE FARM, )
)
        Defendant. )  **DECISION**

Plaintiff appeals the real market value (RMV) of property identified as Accounts 1821253, 1821345, 1821360, 1821386, 1821261, 1821287, 1821402, 1821303, 1821436, 1821444, 1821337, 1821352, 1821378, 1821394, 1821188, 1821204, 1821220, 1821246, 1821329, 1821279, 1821295, 1821311, 1821170, 1821196, 1821212, 1821238, 1821451, 1823549, 1821410, 1821428  (subject property) as determined by the Lane County Board of Property Tax Appeals (BOPTA) Order, dated March 8, 2010.  The tax year at issue is 2009-10.

Defendant filed a written Answer on April 26, 2010, and counterclaimed with a request to further decrease the RMV.

A trial was held on March 30, 2011, in the Tax Courtroom, Salem, Oregon.  Bryce Krehbiel (Krehbiel), Lane County Residential Appraiser and Plaintiff's representative, appeared and testified on behalf of Plaintiff.  Mike Cowles, Lane County Senior Sales Data Analyst, appeared and testified on behalf of Plaintiff.  Gary Pape, subject property owner, appeared and testified on behalf of Defendant.

Plaintiff's Exhibits 1-77 were admitted without objection.

/ / /

/ / /

## I. STATEMENT OF FACTS

Defendant appealed to BOPTA the subject property's 2009-10 real market value. The BOPTA Order dated March 8, 2010, "reduced" the "values on the tax roll" as follows:

| Acct # | RMV per BOPTA | AV per BOTPA | RMV Requested by Plaintiff | AV Requested by Plaintiff |
|---|---|---|---|---|
| 1821253 | $105,945 | $69,161 | $149,900 | $97,855 |
| 1821345 | $166,554 | $108,726 | $239,900 | $156,607 |
| 1821360 | $166,554 | $108,726 | $239,900 | $156,607 |
| 1821386 | $166,554 | $108,726 | $239,900 | $156,607 |
| 1821261 | $166,554 | $108,726 | $239,900 | $156,607 |
| 1821287 | $166,554 | $108,726 | $239,900 | $156,607 |
| 1821402 | $166,554 | $108,726 | $239,900 | $156,607 |
| 1821303 | $166,554 | $108,726 | $239,900 | $156,607 |
| 1821436 | $162,486 | $106,071 | $229,900 | $150,079 |
| 1821444 | $162,486 | $106,071 | $229,900 | $150,079 |
| 1821337 | $162,486 | $106,071 | $229,900 | $150,079 |
| 1821352 | $162,486 | $106,071 | $229,900 | $150,079 |
| 1821378 | $162,486 | $106,071 | $229,900 | $150,079 |
| 1821394 | $162,486 | $106,071 | $229,900 | $150,079 |
| 1821188 | $169,553 | $110,684 | $239,900 | $156,607 |
| 1821204 | $166,554 | $108,726 | $239,900 | $156,607 |
| 1821220 | $166,554 | $108,726 | $239,900 | $156,607 |
| 1821246 | $166,554 | $108,726 | $239,900 | $156,607 |
| 1821329 | $166,554 | $108,726 | $239,900 | $156,607 |
| 1821279 | $105,945 | $69,161 | $149,900 | $97,855 |
| 1821295 | $105,945 | $69,161 | $149,900 | $97,855 |
| 1821311 | $105,944 | $69,160 | $149,900 | $97,855 |
| 1821170 | $123,614 | $80,695 | $174,900 | $114,175 |
| 1821196 | $123,614 | $80,695 | $174,900 | $114,175 |
| 1821212 | $123,614 | $80,695 | $174,900 | $114,175 |
| 1821238 | $123,614 | $80,695 | $174,900 | $114,175 |
| 1821451 | $123,614 | $80,695 | $174,900 | $114,175 |
| 1823549 | $123,614 | $80,695 | $174,900 | $114,175 |
| 1821410 | $162,487 | $106,072 | $229,900 | $150,079 |
| 1821428 | $162,487 | $106,072 | $229,900 | $150,079 |
| Total | $4,467,000 | $2,916,053 | $6,367,000 | $4,156,386 |

(Ptf's Compl at 2-31.)

In its Complaint, Plaintiff requests the court restore the RMV and assessed value (AV) in the aggregate for all 30 properties to $6,367,000 and $4,156,386, respectively. (*Id*. at 1.)

Plaintiff modified its request at trial asking for a lower total RMV of $5,300,290. Defendant requests the court decrease the RMV of the subject property in the aggregate to $3,850,000. (Def's Answer at 1.)

The subject property, called "The Farm," is comprised of 30 condominium townhomes built in 2008 and located on Cal Young Road in Eugene, Oregon. (Ptf's Exs 1-31.) The Farm consists of units of four different sizes: four of the units have a total finished living area of 729 square-feet, six units have a total finished living area of 896 square-feet, eight units have a total finished living area of 1,263 square-feet, and twelve units have a total finished living area of 1,464 square-feet. (Ptf's Ex 33.)

The property is adjacent to Cal Young Road and Norkenzie Road. (Ptf's Ex 31.) Cowles testified that the subject property is located one mile from Oakway Center, near the Oakway Golf Course, and that access to freeways and schools from the subject is "typical." Krehbiel testified that the location of the subject property is "well sited." Krehbiel elaborated by testifying that the subject property is bordered by Class 'C' neighborhoods to the north, east and west. To the south, Krehbiel testified that the subject property is bordered by Class 'A' and 'B' neighborhoods. Krehbiel testified that a Class 'A' neighborhood is the best, Class 'B' is good and Class 'C' is considered to be modest. Cowles testified that the subject is considered to be a Class 'B' neighborhood. Krehbiel testified that the subject property's quality of construction is listed as C4 (or "Quality Class 4 Condominium").

Plaintiff's appraiser for the subject properties, Cowles, has almost 20 years of appraising experience. Cowles spent the majority of this time as an appraiser for the Lane County Assessor's office, but he has also completed a brief stint at the Oregon Department of Revenue, and sometimes works as an independent fee appraiser. Cowles is a Registered County Appraiser

and Senior Sales Data Analyst. Krehbiel also testified. Krehbiel has worked as a state Registered Appraiser since 2003. Prior to that, Krehbiel worked roughly six years for a nonprofit organization in Eugene developing low income housing. Before his work in Eugene, Krehbiel worked as a developer outside Oregon, beginning in 1988. Both Cowles and Krehbiel are experienced and qualified appraisers.

Cowles testified that Plaintiff's Exhibits 1-30 were used by Lane County to track property values. Each condominium unit contained two printed pages of information, including a "Valuation Record." (Ptf's Exs 1-30.) Under the "Valuation Record" heading were the subheadings "Reassess," "OEV," "BOPTA," "Trend," and "Adjudicated." (*Id.*) Under each of these subheadings, values for specific condominium units were listed. (*Id.*) The value under the "Reassess" column was $0 because this indicated the construction of the condominium units and a switch in the property classification. (*Id.*) The value under "OEV" was the initial assessed value when the condominium unit was listed. (*Id.*) The value under "BOPTA" was the value pursuant to the March 8, 2010, BOPTA Order. (*Id.*) The value under "Trend" is what would have been assessed on January 1, 2010, had BOPTA not reduced the RMV as of January 1, 2009. (*Id.*) The value under "Adjudicated" shows the actual value for the January 1, 2010 assessment date. (*Id.*)

At trial, Cowles admitted that it is "difficult to establish values for a project without sales in the project." Cowles testified that in an "ideal situation [there] would have been a sale in The Farm to help value the property," but because there had been no unit sales at the time of the assessment date, he used the next best available tools to estimate RMV – the subject property's last listing prices and comparable sales in the surrounding area. Cowles testified that the units'

original list prices on April 4, 2008 ranged from $207,500 to $425,000. By October 2008, the range in the listing prices had been dropped to between $189,000 and $389,000.

Cowles testified that he arrived at value estimates for the individual subject units by taking their last list prices, discounting them to between 60 and 80 percent of that price (i.e., applying discounts of between 20 and 40 percent), and then breaking them into four price points, which were the values placed on the tax roll for the 2009-10 tax year. Cowles testified that these four price points were $149,900 for the studio units, $174,900 for the one bedroom units, $229,000 for the two bedroom units, and $239,900 for the two bedroom units with dens. Cowles testified that in his "professional opinion [the units] were way overpriced" by their original list prices and therefore he used his "valuation judgment" (based on the last list prices and comparable sales in the surrounding area) in applying the 60 to 80 percent discounts.

Plaintiff presented evidence of comparable sales drawn from "the same area class as the subject property * * * according to the MLS" (referring to an area generally known as "Ferry Street Bridge"). (Ptf's Exs 62-75.) Of the comparable sales presented, Cowles testified that a condominium unit sold on August 29, 2008, for $130,000, established the "low end of the market range for condominiums in this neighborhood[,]" and that a condominium unit sold on June 19, 2008, for $268,300, established the high end of the market range. (Ptf's Exs 62, 74.) Using this range of comparable sales prices, coupled with the subject property's last list prices at the discounted rates, Cowles testified that he arrived at an RMV range of $149,900 to $240,000 for The Farm units: $149,900 for the studio units, $174,900 for the one-bedroom units, $229,000 for the two-bedroom units, and the $239,000 for the two-bedroom units with dens.

During testimony, Cowles pointed to condominium unit sales from the "Terraces at the Pavillion" as being especially similar to the subject property. Unit sales from the Terraces at the

Pavillion were dated June 2008 through May 2009, with sale prices per square-foot ranging from $220 to $233. (Ptf's Exs 66-75.) Cowles testified that the Terraces at the Pavillion were very good comparables to The Farm because they were both Class 4 condos, similar in size, and only 1.7 miles apart. Cowles did, however, note that The Farm is located in a more "residential neighborhood," and Krehbiel testified that The Farm suffers from somewhat limited parking.

During trial, the parties stipulated that an April 2010 auction resulted in the sale of 16 of The Farm's units in May 2010. An additional unit, unrelated to the auction, was also transferred in July 2010. (Ptf's Ex 45.) Pape agreed that the purchase prices were reflected in Plaintiff's Exhibits 34 through 51, except for unit 1510, which according to Pape, never closed. The sale prices (rounded) for the four 729 square-foot units were $103,000, $85,000, $90,000, and $86,000. (Ptf's Exs 34-37.) The sale prices (rounded) for the 896 square-foot units were $137,000, $142,000, $143,000, and $142,000. (*Id*. at 38-41.) Two 1263 square-foot units sold for prices (rounded) of $172,000 and $165,000. (*Id*. at 42-43.) Finally, the seven 1464 square-foot units sold for prices (rounded) of $182,000, $199,000, $190,000, $180,000, $180,000, $182,000, and $185,000. (*Id*. at 44-47, 49-51.)

Pape strenuously objected to the use of the auction sales prices in Plaintiff's comparable sales analysis in order to establish the RMVs for the subject property's units, arguing that they were too far removed from the assessment date (May 2010 sales compared to a January 1, 2009 assessment date) to have any bearing on the RMV for the 2009-10 tax year at issue herein.

Krehbiel testified that while The Farm's original list prices "were a little steep," the price per square-foot for sold units at the auction were "remarkably" lower than the prices per square-foot for the Terraces at the Pavillion units used in Plaintiff's comparable sales analysis. Krehbiel testified that he looked at sales that occurred in the auction for the four different unit sizes, to

arrive at an average sales price for each size grouping; he then trended this average back to the assessment date. Krehbiel used Plaintiff's calendar year 2009 annual ratio study originally developed to trend values from January 1, 2009, to January 1, 2010, applying it here as a backward trend. Using this method, Krehbiel testified that he arrived at a trended value of $100,852 for the 729 square -foot units, $156,043 for the 896 square-foot units, $186,753 for the 1,263 square-foot units, and $205,550 for the 1,464 square-foot units. (Ptf's Ex 33.) On a per square-foot basis, Krehbiel's values are $149 per square-foot, $174 per square-foot, $236 per square-foot, and $140 per square-foot, respectively for the four different sized units. The cumulative RMV presented for the 30 condominium units at issue is $5,300,290. (*Id*. at 2.)

Krehbiel testified that, as a check on his methodology and value estimates for the subject properties as of January 1, 2009, he trended the values forward to "2010," and the values he produced were very close to the actual May 2010 sales of the subject units. Krehbiel testified that this suggested that Plaintiff's values for this appeal were "in the ballpark."

Pape testified that in March 2009, The Farm's owners agreed that mass marketing the complex for sale as a whole would provide the best option. Pape testified that the intial asking price of $5.2 million for the complex was lowered to $4.2 million within three months. Pape testified that in May or June of 2009 he received an offer of $3.2 million, another offer in May of $3.7 million, and another offer of $3.75 million shortly thereafter. After a short bidding war, Pape testified that The Farm's real estate brokers were able to get one of the bidders (Willamette Builders, LLC) to offer up to $3.85 million, which was accepted. Pape testified that closing was to happen as soon as possible but the deal fell through in October when the prospective buyer was unable to close.

/ / /

After consulting with people who were more "real estate proficient," Pape testified that he was advised to hold on to the complex for three to four years until the market improved and rent the units as apartments in the meantime. Pape testified that, at the time, this was a popular option for many newly constructed condominium projects. Pape testified that in late 2009 and early 2010 the direction of the condominiums' RMV improved due to the federal stimulus package. Pape testified that the stimulus package extended the first time homebuyer credit to the end of April 2010, thereby making the condo units at The Farm more attractive to buyers. For this reason, Pape explained that he decided not to rent any of the units until after the auction date in April 2010. Pape testified that only 17 of the units offered at auction were bid upon, and all the minimum bids were met.

The parties stipulated during trial that a Condo Plat for The Farm was registered with the County in June 2008. Krehbiel testified that as of the assessment date, The Farm units' highest and best use was as individual condominium units. Pape testified that the highest and best use of The Farm on the assessment date was as an apartment complex. As authority, both parties cited to *First Interstate Bank v. Dept. of Rev.*, 306 Or 450, 760 P2d 880 (1988) (*First Interstate Bank*), to back up their positions. Krehbiel testified that, based on *First Interstate Bank,* each lot must be individually valued. Krehbiel was referring to page 453 of that decision, where the court ruled that ORS 308.205, when considered in the context of several other relevant statutes, "requires the true cash value of each lot to be assessed separately." Conversely, Pape testified that under *First Interstate Bank,* it is "possible that highest and best use be a group of lots." Pape was referring to a footnote on page 453, where the court states that "[i]t is possible that in certain situations, the highest and best use of a law would be as part of a group of lots." Pape testified

/ / /

that at the time of the assessment date there was "no market for a new condominium project" and the "only value was in the entire project [and] not as individual condos."

## II. ANALYSIS

The issue before the court is the real market value of the subject property on January 1, 2009, the assessment date for the 2009-10 tax year. *See generally* ORS 308.007.[1] "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620, at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). RMV is defined in ORS 308.205(1), which reads:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."

A.    *Highest and Best Use*

The subject property is improved property. Improved property is directly related to highest and best use analysis. Appraisal Institute, *The Appraisal of Real Estate* 361 (13th ed 2008). Highest and best use is defined as: "[t]he reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value." *Id*. at 278. A highest and best use analysis assists the appraiser "to interpret[] the market forces that affect the subject property and identif[y] the use or uses on which the final opinion of value [should be] based." *Id*. at 139. "An appraiser determines the highest and best use of property by weighing market demand for the uses, products or services the property is designed to provide. That analysis focuses on the uses to

---

[1] All references to the Oregon Revised Statutes (ORS) are to the 2007 edition.

which a property can most profitably be put." *STC Submarine, Inc. v. Dept. of Rev*., 13 OTR 14, 18 (1994).

The parties disagree about the subject property's highest and best use. Plaintiff argues that the highest and best use on January 1, 2009 was as individual condominium units. Defendant, on the other hand, argues that the highest and best use at the time of assessment was as an apartment complex. "It is possible that in certain situations, the highest and best use of a lot would be a part of a group of lots." *First Interstate Bank,* 306 Or at 453, n 2 citing *Sabin v. Dept. of Rev*., 270 Or 422, 426-27, 528 P2d 69 (1974)). "If that were the case, it would be appropriate to assess that lot based on its value as part of a group." (*Id.*) Although The Farm units were successfully condominiumized in June 2008 when the Condo Plat was registered, Defendant reported that the most "marketable" option in late 2008 was as an apartment complex. After a contract deal to sell the complex as a whole fell through in October, the subject property's owners decided to wait three to four years for the real estate market to turn around before putting the units back on the market. Defendant also stated that this was a common practice at the time for new condominium projects.

Plaintiff presented evidence of individual condominium unit sales, dating from June 2008 through May 2009, which were used as part of a comparable sales analysis. (Ptf's Exs 62-75.) Plaintiff also compared sales prices from the April 2010 auction of some of the subject property's units as a check on the valuation range that Plaintiff derived for the subject property's units.

The evidence suggests to the court that the highest and best use of the subject property was as individual condominium units. That was the highest and best use on the applicable assessment date of January 1, 2009, and remained so thereafter, as evidenced by the fact that

when the property owners decided to sell the units in a bulk transaction under silent bid auction in April 2010, the property was advertised as "21 new townhome condominiums." The property owners presented no evidence to persuade the court that any use other than condominiums was the highest and best use. There was testimony from Defendant that experts advised Pape, who took over management of the property in June 2009, that it might be most profitable to rent the units as apartments for several years and then, assuming the market rebounded, to sell the units as individual condominiums. That suggests that the "experts " Pape spoke with believed that the properties' real value was as individual condominium units, and that the rental of the units as apartments was an "interim" use during a poor economy.

B.      *Approaches of Valuation – Real Market Value*

The three approaches to real market valuation are the cost approach, income capitalization approach and comparable sales approach. *See* ORS 308.205(2) and OAR 150-308.205-(A)(2). All three approaches must be considered even if one is determined to be inapplicable. *Id.* The comparable sales approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp v. Lane County Assessor,* TC-MD No 060354D at 6 (Apr 3, 2007), citing Appraisal Institute, *The Appraisal of Real Estate* 335 (12th ed 2001).

The subject property is a 30 condominium complex constructed in 2008. Neither party presented a cost or income approach. A cost approach is an obvious choice in this case given the newness of the subject property, and, if done right, would have been very helpful in determining the value of the subject property. "The cost approach is 'particularly useful in valuing new or nearly new improvements.' " *Magno v. Dept. of Rev.*, 19 OTR 51, 55 (2006).

/ / /

Plaintiff presented its case through the testimony of two very qualified appraisers. They attempted the admittedly difficult assignment of valuing the subject condominium units using various approaches. Plaintiff's two appraisers relied on a combination of pre-assessment date comparable sales and mass appraisal techniques to arrive at the requested aggregate RMV of $5,300,290. That number is approximately $1 million less than the value originally placed on the rolls by the assessor's office and requested by Plaintiff in its initial Complaint to this court. Plaintiff revised its request based on its more considered analysis of the property for purposes of trial. Plaintiff also relied on post-assessment date unit sale prices from May 2010 transfers of the April 2010 auction of units within the subject complex. Those numbers lowered Plaintiff's value conclusions. Defendant objects to the use of the post-assessment date sales, although, in this case, from the court's perspective, those post-assessment date sales work to Defendant's advantage.

Plaintiff further argues that Defendant's reliance on several bulk purchase offers, none of which resulted in a sale, reflect a discounted cash flow approach to valuation and, given that the offers never resulted in a consummated deal, the numbers presented by Defendant are speculative.

Defendant, who had the property built, did not present any cost evidence; although Pape believed that an appraisal was probably done for financing, he testified that he had no recollection as to the value arrived at for that purpose. Defendant's focus on the attempted bulk sale of the majority of units through a closed bid auction is unpersuasive because it did not result in a sale and was likely designed to recoup the developer/shareholders investment. The court was particularly troubled that Defendant refused to provide Plaintiff with actual cost data.

In the final analysis, the value of property is ultimately a question of fact. *Chart*

*Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001) (citation omitted). By statute, Plaintiff has the burden of proof and must establish an error in the record assessment by a "preponderance" of the evidence. ORS 305.427. This court has previously ruled that a "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971); *see also Riley Hill General Contractor v. Tandy Corp.*, 303 Or 390, 394, 737 P.2d 595 (1987) (where the Oregon Supreme Court explained that the derivation of the word "preponderance" is Latin in origin and "translates to 'outweigh, be of greater weight.' "). Evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof. *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). This court has previously noted that value is a range rather than an absolute. *Price v. Dept. of Rev.*, 7 OTR 18, 25 (1977).

Plaintiff has presented several value scenarios and, in the end, persuaded the court by a preponderance of the evidence that the Board erred slightly in lowering the value (RMV) to a cumulative total of $4,467,001. The court concludes that Plaintiff's cumulative RMV of $5,300,290 fairly represents the value of the 30 condominium units as of January 1, 2009. The four 729 square-foot units shall be valued at $100,852, the six 896 square-foot units shall be valued at $156,043, the eight 1263 square-foot two-bedroom units shall be valued at $186,753, and the 12 two-bedroom units measuring 1464 square-feet shall be valued at $205,550.

## III. CONCLUSION

The court has carefully reviewed the evidence presented and concludes that Plaintiff's appeal should be granted, with the total RMV of the subject property, 30 condominium units, increased to $5,300,290, as set forth immediately above. Any adjustments required to be made to assessed value (AV) shall be done by the Assessor's Office.

Now, therefore, IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is granted and Defendant's counterclaim for a further reduction in the RMV denied.

Dated this ____ day of January 2012.


_____
DAN ROBINSON
MAGISTRATE


*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Dan Robinson on January 24, 2012. The Court filed and entered this document on January 24, 2012.*