IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

LANE COUNTY ASSESSOR,         )
                                        )
          Plaintiff,             )   TC-MD 100117C
                                          )
         v.                   )
                                          )
FIRE AND WATER LLC,         )
                                        )
          Defendant.      )  **DECISION**

Plaintiff Lane County Assessor appeals from an order of the Lane County Board of

Property Tax Appeals (Board), dated February 4, 2010, reducing the real market value (RMV) of

property identified as Account 1747037 (subject property) for tax year 2009-10. A trial was held

on January 12, 2011. David Sohm (Sohm), Registered Appraiser 3, Lane County Assessment

and Taxation, appeared and testified on behalf of Plaintiff. David E. Carmichael, Attorney at

Law, appeared on behalf of Defendant. Chuck Thompson (Thompson), an appraiser, testified on

behalf of Defendant.

For ease of reference, the parties will be referred to as the County and Taxpayer. The

County's Exhibits 1and 2, and Taxpayer's Exhibit A were received without objection.[1]

/ / /

/ / /

/ / /

/ / /

/ / /

---

[1] Taxpayer mistakenly marked its exhibit "Plaintiff's Exhibit 1." That error was addressed prior to the commencement of trial and the exhibit (an appraisal) was changed to Defendant's Exhibit A. The court will refer to the exhibit throughout its decision as "Def's Ex A."

# I.  STATEMENT OF FACTS

A.    *The property*

The subject property is a 14,880 square foot[2] open, free span, enameled, metal clad industrial warehouse building situated on an 88,048 square foot (2.02 acre) parcel of land, east of Highway 99 in Junction City, which is considered to be part of the Eugene-Springfield area. (Ptf's Ex 1 at 4, 7, 8; Def's Ex A at 7.)  The warehouse includes three offices, a bathroom, three metal roll-up doors, a loading dock, a 1,080 square foot unpermitted mezzanine apartment, and an 1,800 square foot (30 foot by 60 foot) open end covered lean-to storage area.  (Ptf's Ex 1 at 8; Def's Ex A at 20-21.)  The apartment is a two-bedroom, one bathroom area at the rear of the warehouse and segregated from the main warehouse.  (*Id*.)  The apartment was built without the required permits and was intended to be occupied by a night watchman.  (*Id*.)  The building sits on a reinforced concrete slab and has poured concrete footings.

The site has level topography and is gravel surfaced, with 6,300 square feet of paved parking adjacent to the building, an 18 foot by 25 foot truck loading area, a well and septic system, and a water runoff system.  (Ptf's Ex 1 at 7, 8.)  The site is accessible from Booth Street across a 35 foot wide paved driveway, and is completely fenced by a six foot perimeter chain link fence topped with three strands of barbed wire. (*Id.*; Def's Ex A at 14, 20)  The property is zoned M-3, Heavy Industrial, and is located approximately five miles north of Eugene.  (Ptf's Ex 1 at 10.)  Electric service is provided by underground power lines.  (*Id*. at 7.)  The M-3 zoning does not permit use of the apartment for residential purposes.  (Def's Ex A at 19.)

---

[2] The parties differed in the size of the improvement when making their calculations. The Plaintiff found that the building to be 14,880 square feet and the Defendant used 13,800 square feet. The court will use 14,880 square feet for its analysis.

In his testimony, Sohm described the location of the subject property as a "rural but newly developed area" where the neighborhood is "sparsely developed with residential, commercial and industrial properties." (*See* Ptf's Ex 1 at 6.) The County anticipates that the area will be "intensively developed in the future * * *." (*Id.* at 10.) Taxpayer, on the other hand, put more emphasis on the rural location of the subject property, insisting that its rural location detracts from value.

Taxpayer purchased the property as a vacant lot in August 2006 for $72,000, and has owned the property ever since. (Def's Ex A at 16.) The sale price was "set in recognition of there being significant wetlands * * * [and] the reported cost of the mitigation was $12,000." (*Id.*) Taxpayer began development of the property with the existing improvements (building and yard) in 2007 and completed the project in 2008. As of the assessment date, January 1, 2009, construction was completed.

Both parties agree that there are some water problems on the subject property. Thompson, who valued the property for the Taxpayer, testified to a conversation he had with the property manager. According to Thompson, the manager stated that seasonal flooding occurs near the small paved area and that the subcontractor who did the site preparation did not elevate the area where the building is located. As a result, the foundation is purportedly below the 100 year floodplain.[3] Sohm, on the other hand, testified that one of the principles of the Taxpayer told him there was a pond on the property where seasonal runoff water is collected during times of heavy rain. Sohm insists that the principal did not mention anything about the foundation being below the 100 year floodplain level, and that he was not privy to any official information

---

[3] The owner of the subject property was out of the country at the time of trial and therefore unable to appear at the court and testify as to the claims regarding flooding issues.

verifying the floodplain problem. Sohm was told that there was a sump pump in the loading well.

The parties also have differing views on how to treat the unpermitted mezzanine apartment. Access to the mezzanine is via an outside stairway at the rear of the building, and the apartment space is physically segregated from the rest of the warehouse. As a result, one must exit the warehouse and walk around to the back of the building and up a flight of external stairs to enter that space. Even though both parties agree that the mezzanine apartment is not legally permitted for residential uses, Sohm testified that he "treated the apartment as additional office space" which renders total office space of 2,160 square feet, including the 1,080 square foot apartment. The reasoning behind his opinion is that, "according to the statute, the existing property is assessed 'as is' regardless of the legality of the use[,]" and, accordingly, the space can be converted into office space. (Ptf's Ex 1 at 10.) Taxpayer's appraiser, Thompson, on the other hand, gave "no contributory value" to the mezzanine apartment based on the fact that it is "not legally permitted." (Def's Ex A at 15.) Taxpayer repeatedly brought out during trial that the mezzanine apartment was intended for use by a night watchman.

B.     *The value*

The County originally valued the RMV of the property at $857,730, allocating $655,380 to the improvements and $202,350 to the land. (Ptf's Compl at 3.) Taxpayer appealed to the Board, and the Board reduced the total RMV to $591,000, allocating $388,650 to the improvements and a leaving the land RMV undisturbed at $202,350. The County timely appealed the Board's order to this court, requesting a change in the RMV to $717,800. (*Id*. at 1.) Taxpayer filed an Answer requesting that the court sustain the Board's order

Both parties submitted appraisals for the trial. Both appraisers utilized the three standard approaches to valuation. Sohm, the County's appraiser, estimated the value at $793,000 under the cost approach, $744,000 under the sales comparison approach, and $733,000 under the income approach. (Ptf's Ex 1 at 23.) Sohm valued the land at $217,000. (*Id*. at 13.) Sohm's land value is based on a bare land value of $1.46 per square foot, plus $1 per square foot for the costs of preparing the site for development. (*Id*. at 12-13.) Sohm testified that he placed primary reliance on the sales comparison approach, and arrived at a final value estimate (reconciliation) for the entire property (land and improvements) of $744,000 as of January 1, 2009. (*Id*. at 24.)

Thompson, who valued the property for Taxpayer, utilized the three approaches to value and concluded a total property value estimate of $590,000 as of January 1, 2009. (Def's Ex. A at 6, 40.) Thompson estimated the value at $607,000 under the cost approach, $590,000 under the income approach, and $585,000 under the sales comparison approach. (*Id*. at 31, 36, 39, 40.) Thompson placed primary reliance on the income approach. (*Id*. at 40.) Thompson valued the land at $106,000, or $1.20 per square foot. (*Id*. at 30, 40.)

## II. ANALYSIS

The issue before the court is the real market value of the subject property as of the January 1, 2009, assessment date for 2009-10 tax year. ORS 308.007 (defining assessment year, tax year, and assessment date); ORS 308.210(1) (requiring the assessor to value property each year on January 1 of the assessment year).[4]

"Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)).

---

[4] Unless otherwise noted, all references to the Oregon Revised Statutes (ORS) are to year 2007.

Real market value is defined in ORS 308.205(1), which states that "[r]eal market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."

A.      *Highest and best use*

Highest and best use is defined as "[t]he reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value." Appraisal Institute, *The Appraisal of Real Estate* 278 (13th ed 2008).

A highest and best use analysis helps the appraiser "to interpret[] the market forces that affect the subject property and identify the use or uses on which the final opinion of value [should be] based." *Id.* at 139. "An appraiser determines the highest and best use of property by weighing market demand for the uses, products or services the property is designed to provide. That analysis focuses on the uses to which a property can most profitably be put." *STC Submarine, Inc. v. Dept, of Rev.*, 13 OTR 14, 18 (1994).

In determining whether the subject property's highest and best use is its current use, the first considerations are the tests of physical possibility and legal permissibility. Both Sohm and Thompson are in agreement that the highest and best use for the subject property as vacant and as improved was industrial use with two issues to be addressed.[5] However, Thompson argues that the current use of the subject property as a warehouse and offices "is representative of the

_____

[5] Sohm concluded that "[d]ue to the location and size, the physically possible legal use of the vacant site * * * is estimated to be industrial development[]" and "existing warehouse and office use of the building represents a physically possible, legally permitted, and financially feasible use of the property * * *." (Ptf's Ex 1 at 10.) Similarly, Thompson reached the conclusion that the highest and best use of the site as vacant is "for some industrial use [given] the zoning and the location" and the current use is representative of the highest and best use as improved. (Def's Ex A at 27.)

Highest & Best Use" with the exception that there is "excess land." (Def's Ex A at 27.) Thompson calculated the excess land to be approximately 39,748 square feet. (*Id.* at 14.) The court agrees with the parties' conclusion that the highest and best use of the subject property is industrial. The property is zoned for industrial development (the subject property is zoned M-3, Heavy Industrial District) and the evidence supports such a finding.

As for the excess land claim, Thompson testified that a typical land to building ratio for similar types of property is 3.5 to one and the ratio of the subject property is 6.38 to one. He asserted that the subject property only needs 48,300 square feet, and that the subject, at approximately 88,000 square feet, has 39,748 square feet of excess land. However, the court is not persuaded by Thompson's argument because he failed to present the court with any form of reliable evidence to buttress his testimony about the excess land. Moreover, Thompson valued the entire 88,000 square feet (rounded) of land at $1.20 per square foot in his cost approach and, typically, excess land would be valued at a lower amount under the theory that the hypothetical buyer would pay less for the additional unnecessary land. (*Id*. at 30.) Thompson, in fact, does indicate at page 36 of his appraisal report that there is 39,748 square feet of excess land which is worth $.60 per square foot (half the value of the necessary land), which generates an excess land value of $23,849. However, given that the property is only on the outskirts of town and is not served by city sewer or water, a two acre site does not seem disproportionate for property with a 15,000 square foot building that has approximately 6,300 square feet of pavement (the balance of which is graveled), and is in an area that experiences some flooding during heavy rains. After careful consideration, the court rejects the claim of excess land.

B.      *Valuation of property*

The statutory definition of RMV is set forth above. That statute further provides that RMV "shall be determined by methods and procedures in accordance with rules adopted by the

Department of Revenue[,]" pursuant to certain statutorily enumerated principles. ORS 308.205(2). Those statutory principles that guide the Department in its promulgation of valuation methods and procedures require an RMV determination based on "[t]he amount a typical seller would accept or the amount a typical buyer would offer that could reasonably be accepted by a seller of property[,]" and require that "[a]n amount in cash shall be considered the equivalent of a financing method that is typical for a property." ORS 308.205(2)(a), (b). Finally, the statute provides that property without an immediate market value shall have an RMV "that would justly compensate the owner for loss of the property." ORS 308.205(2)(c).

The Department's rule, in turn, generally provides for the valuation of all real property based on the consideration of the three standard approaches to valuation. OAR 150-308.205-(A)(2)(a).[6] Those approaches are the sales comparison approach, the cost approach, and the income approach. *Id.*; *see also* Appraisal Institute, *The Appraisal of Real Estate* 130 (13th ed 2008). The rule does not require the use of all three approaches, but merely the consideration thereof.

1. *Burden of proof*

The burden of proof in the Tax Court is a "preponderance" of the evidence, and falls upon the party seeking affirmative relief, which, in this case, is the County. ORS 305.427. The Oregon Supreme Court has stated that " '[p]reponderance' derives from the Latin word 'praeponderare,' which translates to 'outweigh, be of greater weight.' 8 Oxford English Dictionary 1289 (1933). With regard to the burden of proof or persuasion in civil actions, it is generally accepted to mean the greater weight of evidence." *Riley Hill General Contractor, Inc. v. Tandy Corp.*, 303 Or 390, 394, 737 P2d 595 (1987). This court has previously ruled that

---

[6] References to the Oregon Administrative Rules (OAR) are to the current edition of those rules.

"[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971) (citation omitted).

2.     *Land value*

Sohm first estimated the value of the land using three sales and one listing with prices per square foot, but out of a low of $1 to a high of $1.64, Sohm estimated the value of the raw land at $1.46 per square foot. (Ptf's Ex 1 at 12.) That figure is derived from Sohm's sale #3, which is one sale also used by Taxpayer's appraiser, Thompson. (*Id.*) Multiplying that figure by the subject's 88,048 square feet results in an indicated value of $128,550. (*Id.*) Sohm then adds another $1 per square foot for site preparation costs. Adding that amount to the base or raw land value resulted in a final indication of value of $217,000. (*Id.* at 13.)

Thompson analyzed six bare land sales with prices ranging from a low of $1 per square foot to a high of $2.15 per square foot. (Def's Ex A at 29.) The first three comparable sales were in the same industrial park as the subject and sold for $1.46 per square foot, $1 per square foot, and $1.15 per square foot. Thompson found those three sales to be the best indicators of value and concluded that an appropriate indication of value for the subject was $1.20 per square foot as of January 1, 2009. (*Id.* at 30.) Thompson multiplied the 88,048 square feet of land by $1.20 per square foot to arrive at an estimated land value for the subject property of $106,000 (rounded). (*Id.*)

The court believes that Thompson presents a more persuasive case for a raw land value at $1.20 per square foot. However, the court believes Sohm is correct in adding in an additional cost for site preparation. Finding Sohm's $1 figure to be high, the court concludes that an appropriate amount is $.50 per square foot. That results in an indicated land value of $150,000 (rounded).

3.      *Improvement value*

As indicated above, Sohm estimated the value of the property for the County using all three approaches to value.  Some of the approaches necessarily include a land value component.  The same is true for Thompson's value approaches.  Specifically, the sales comparison and income approaches both include a land value component, making the court's a section heading of "improvement value" somewhat misleading.  Nonetheless, the court is following the presentation of evidence by the parties and believes the following analysis will not confuse the reader.

a.      Cost Approach

Sohm's value estimate for the County under the cost approach is $793,311, and is based on a value of approximately $40 per square foot for 13,800 square feet of open span warehouse and $19.70 for the 1,080 square foot mezzanine apartment. (Ptf's Ex 1 at 15.)  Sohm added another $57,317 (10 percent) for indirect costs such as financing, and $55,600 for paving and fencing for an indicated value of $686,085.  (*Id*.)  Sohm added another five percent, or $34,304, for developer's overhead and profit, to arrive at a total cost estimate of $720,389.  (*Id*.)  Sohm then deducted 20 percent, or $144,078 for depreciation in the form of external obsolescence, to arrive at a final depreciated replacement cost for the building of $576,311.  (*Id*. at 14, 15.)  Sohm then added $217,000 for the land, to arrive at his final value of $793,000 under the cost approach.  (*Id*. at 15.)

Thompson has a cost value estimate of $607,000 using a lesser value of $33.46 per square foot for the 12,000 square feet of open area enclosed warehouse and $12 per square foot for the open end covered lean-to storage area.  (*Id*. at 30-31.)  Those numbers generate a base cost of $423,120.  (*Id*. at 30.)  Thompson adds $88,385 for site improvements (septic, well, fence, paving, and gravel), for a total replacement cost new of $511,505.  (*Id*.)  Thompson then

subtracts $10,230 for depreciation at two percent for a depreciated replacement cost of $501,275. (*Id*. at 31.) Adding the $106,000 land value brings Thompson to his $607,275 value, which he rounds to $607,000. (*Id*.)

Although the parties are the farthest apart in their value estimates under the cost approach, differing by $186,000, neither party placed primary reliance on this approach. Accordingly, the court will move on to the other two approaches to value.

> b.  Sales comparison approach

Sohm looked at 19 industrial property sales in considering his comparable sales approach and ultimately selected four sales. (Ptf's Ex 1 at 17.) The prices per square foot range from a low of $39.11 to a high of $66.85. (*Id*.) Sohm undertook a detailed analysis of the size, location, age, and functional characteristics of his comparable sales and concluded that a good indication of value for the subject was $50 per square foot. (Ptf's Ex 1 at 19.) Multiplying that figure by the total building area of 14,880 square feet results and an indicated value of $744,000. In the reconciliation portion of his appraisal, Sohm indicates that he placed primary reliance on the sales comparison approach in concluding that the property had a value of $744,000 as of January 1, 2009. (*Id*. at 24.)

Not surprisingly, Thompson, who prepared the appraisal for the Taxpayer, analyzed four comparable sales and determined that the main warehouse space (12,000 square feet of enclosed shall) had a value of $45 per square foot. (Def's Ex A at 38-39.) The court finds that figure suspect given that Thompson's comparable sales had per foot values of between $39.07 and $54.76, with three of the four properties selling for more than $50 per square foot. (*Id*. at 38.) The court finds Sohm's $50 per square foot value a better indicator for the subject.

/ / /

However, the court feels that Thompson is correct in valuing the covered, open end lean-to storage area at a lesser value of $12 per square foot. The indicated value of that area is therefore $21,600.

The other area of disagreement is how to treat the 1,080 square foot mezzanine apartment, which can only be accessed by an exterior stair well at the back of the property. The County valued that space at $19.70 per square foot under its cost approach, while Taxpayer places no value on that space. Sohm's theory is that the apartment, while not a permitted use under current zoning, could be converted to office space and therefore carries some potential value to a prospective buyer. The court agrees, although it believes that Sohm's figure is high. The court believes that the disputed space would be worth the same as the open end lean-to storage area, which Thompson valued at $12 per square foot. That suggests a value for the apartment of $13,000 (rounded).

Taking all of those numbers into consideration, the indicated value of the subject property under the sales comparison approach is $634,600, or $635,000 (rounded). That number is broken down as follows: $600,000 for the main warehouse, at $50 per square foot multiplied by 12,000 square feet; $21,600 for the 1,800 square foot lean to at $12 per square foot; and $13,000 for the apartment.

c.      Income capitalization approach

Sohm estimated the value under this approach at $733,000, using a net operating income (NOI) of $54,960, and a capitalization rate of 7.5 percent. (Ptf's Ex 1 at 22.) Sohm's potential gross income of $64,284 is based on a release rate of $.37 per square foot on triple net basis, and allowing for a 10 percent vacancy and credit loss ($6,428), and an overall expense amount of five percent ($2,893). (*Id*. at 21, 22.) Sohm's capitalization rate of 7.5 percent is derived from

the four comparable sales with rates ranging from a low of 6.27 percent to a high of 7.48 percent. (*Id*. at 17.) Sohm explained that he chose a rate slightly higher than the four rates he found in his comparable sales because of the "financial meltdown" that occurred at the latter part of calendar year 2008. (*Id*. at 22.) The major weakness of Sohm's income approach is that it relies on six listings in no actual existing leases.

Thompson, on the other hand, evaluated actual lease rates for five comparable properties. (Def's Ex A at 33.) Thompson's lease rates ranged from a low of $.33 per square foot to a high of $.36 per square foot. (*Id*.) Thompson, a highly qualified appraiser, as is Sohm, determined that an appropriate lease rate was $.33 per square foot per month for the 12,000 square feet of main warehouse, and $.20 per square foot for the 1,800 square foot lean-to storage area. (*Id*. at 34.) The combined monthly rent is $4,320, which generates a potential gross income of $51,840. (*Id*. at 34.) Thompson subtracted only five percent for vacancy and credit loss ($2,592), compared to Sohm's 10 percent figure, but used a higher expense percentage of eight percent compared to Sohm's five percent figure, to arrive at a NOI of $45,308. (*Id*. at 35.) The court finds Thompson's NOI more persuasive. Thompson then applied a market derived capitalization rate of eight percent, to arrive at an indicated value of $554,550. (*Id*. at 35, 36.) Thompson added $33,849 for the excess land to arrive at a final indicated value under the income approach of $590,000 (rounded). (*Id*. at 36.) That number should be $10,000 lower using Thompson's numbers because his excess land value is actually $23,849, not $33,849.

C.      *Reconciliation*

The court has painstakingly reviewed the evidence presented and, after a lengthy and thoughtful deliberation, concludes that the real market value of the subject property should remain undisturbed at the Board's value of $591,000.

III. CONCLUSION

After a careful review of the evidence, the court concludes that the value of the subject property, identified as Account of 1747037, was $591,000 as of January 1, 2009, including site developments. Plaintiff's appeal is therefore denied. Now, therefore,

IT IS THE DECISION OF THIS COURT that the 2009-10 real market value of the subject property identified as Account 1747037 is $591,000.

Dated this ___ day of January 2012.

_____

DAN ROBINSON
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Dan Robinson on January 24, 2012. The Court filed and entered this document on January 24, 2012.*