## STC SUBMARINE, INC.
*v.*
## DEPARTMENT OF REVENUE
(TC 3426)

David L. Canary, Garvey, Schubert & Barer, Portland, represented plaintiff.

James J. McLaughlin, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for defendant rendered January 25, 1994.

**CARL N. BYERS, Judge.**

Plaintiff appeals the 1991 assessed value of its building and structures used to manufacture marine fiber optic cable. The central issues are the highest and best use of the facility and the concept of real market value as it relates to the building and structures.

### FACTS

The subject property is located on the Willamette River in the Rivergate Industrial District of north Portland. The plant was designed specifically for plaintiff's use in manufacturing fiber optic cable. The building has a ground floor area of 189,000 square feet. Its high eaves of 37 1/2 feet and 54 feet accommodate a second floor office space in the north end and a mezzanine area above the storage tanks, resulting in a total gross area of 222,200 square feet. Although constructed with conventional tilt-up concrete walls, the building is higher than typical industrial plants to permit the handling of fiber optic cable without bending it too sharply. The steel frame is also heavier than most similar industrial buildings, using 30-inch I beams rather than 6-inch or 12-inch I beams. In addition, the concrete floor throughout the building is 10-inches thick instead of the usual 6 inches.

Additional features were incorporated into the design of the building specifically for plaintiff's use. Eight large open concrete tanks, 36 feet in diameter and 18 1/2-feet deep, are used to test and store the cable. The great weight of these tanks, when filled with water and cable, requires a special foundation. There are 288 70-foot-long pilings capped with a 2 1/2-foot-thick concrete raft footing to provide support for the tanks. There are also pilings under the heavy strander machines.

The subject property includes a marine dock adjacent to the building. The dock provides capacity for direct loading and unloading of oceangoing vessels. There is no dispute as to the value of the dock using the cost approach. Consequently, the analysis of value pertains primarily to the building.

## PLAINTIFF'S APPRAISAL

Plaintiff's appraiser determined that it would be error to value the subject property for its specific use of manufacturing marine fiber optic cable. He reasoned that such an approach would result in a value in use rather than a value in exchange. He also asserted "that neither the property's design, construction material, nor layout are so unique [and] that its utility is restricted solely to the function for which it was originally built." This appraiser classified the building as a general-purpose industrial building but with a high ceiling, extra thick floor, and large storage tanks. He concluded that these special features were superadequacies and that the market would not compensate for them.

Based on this highest and best use analysis, plaintiff's appraiser utilized the three approaches to value. Using the sales comparison approach, he analyzed six sales of typical light industrial or warehouse buildings. His analysis of these sales indicated the subject property would have a market value of $25.40 per square foot. Multiplying this by the total of 222,200 square feet gave him an indicated value of $5,643,880.[1]

The same appraiser used seven comparable rental properties in the income approach to obtain an indicated rental value of 50 cents per square foot for office space and 25 cents per square foot for manufacturing area. In this approach, he subtracted 19,000 square feet to account for the unusable tank area. By using a net operating income of $673,835 and a 10 percent capitalization rate, he calculated an indicated value of $6,738,354. Deducting land valued at

---

[1] Because the appraiser determined the large storage tank area was "not economically adaptable to alternative uses," that area should have been deducted. Assuming the tank area is 19,000 square feet, at $25.40 per square foot the indicated value of the building should have been reduced by $482,600.

$1,470,800 gave an indicated value for the building of $5,267,554.

In the cost approach, the appraiser calculated reproduction cost less physical depreciation at $11,012,304. However, because he viewed the high ceilings and extra steel and concrete as "superadequacies," he deducted those from the cost. He also deducted capitalized excess operating costs associated with those features. Consistent with this highest and best use analysis, the appraiser recognized the building needed more truck doors to be used as a typical industrial building. Therefore, he deducted the cost of installing additional truck doors as curable functional deficiencies. After total deductions of $5,208,569, his cost approach gave an indicated value of $5,803,735 ($5,804,000 rounded).

## DEFENDANT'S APPRAISAL

Defendant's appraiser concluded that highest and best use of the subject property was its current use. He determined that its current use was legally permissible, physically possible, appropriately supported and financially feasible. His study of the industry found similar facilities (there are two others in the United States) were 100 percent occupied with no indication that the market was diminishing. Based on this determination of highest and best use, he found the property had no immediate market. Although there were sales of business enterprises whose assets included fiber optic cable manufacturing plants (including the subject), there were no discrete sales which would permit the use of the comparable sales approach. Defendant's appraiser was also unable to use the income approach because he found no comparable rental properties.

Defendant's appraiser used plaintiff's asset list to calculate a reproduction cost new of $10,360,597 (excluding the dock). From this he deducted $800,736 for depreciation, resulting in an indication of value by the cost approach of $9,559,861.

## HIGHEST AND BEST USE

The positions taken by the parties makes highest and best use of the property the critical issue in this case.

The property was designed for and is being used to manufacture marine fiber optic cable. Plaintiff's appraiser rejected the current use as the highest and best use of the property on two grounds, theoretical and practical. Plaintiff makes three arguments: (1) If the property's current use is its highest and best use, any appraisal based on this analysis will reflect use value or investment value; (2) finding current use is the highest and best use ignores the reality of "what would happen" if plaintiff sold the plant; and (3) highest and best use deals with the requirements of the marketplace, not the requirements of a specific user. The court disagrees with plaintiff's appraiser on all points.

■ Plaintiff's appraiser confuses highest and best use analysis with valuation analysis. A highest and best use analysis "is an economic study of market forces focused on the subject property." Appraisal Institute, *The Appraisal of Real Estate* 276 (10 ed 1992). An appraiser determines the highest and best use of property by weighing market demand for the uses, products or services the property is designed to provide. That analysis focuses on the uses to which a property can most profitably be put.

■ Highest and best use is not determined by ascertaining whether there are market transactions indicating a demand for a property. That analysis is too general. Rather, it is "[t]hat reasonable and probable use that will support the highest present value as of the date of the appraisal." *Freedom Federal Savings & Loan v. Dept. of Rev.*, 310 Or 712, 725, 801 P2d 809 (1990). For example, assume there is only one hotel in a small city. If there are no comparable sales to indicate that the hotel would sell as a hotel, plaintiff's theory would suggest that because a hotel can be used as apartments, its highest and best use is for apartments. However, if there is market demand for hotel services the highest and best use is for a hotel, not apartments.

■ Plaintiff's appraiser also found that the current use was not the highest and best use from a "practical" point of view. He concluded that the subject was not restricted to the function for which it was built, but could be used as a light industrial building or as a distribution warehouse. These uses, however, are not highest and best uses, but lower and lesser uses. Valuing the subject as a light industrial building

produces a lower value, not a higher value. *The Appraisal of Real Estate* states: "The highest and best uses * * * are generally consistent with, and similar to, surrounding uses * * *. However, a property's highest and best use may be unusual or even unique." *Id.* at 289. Valuing this unique property as if it were generic is contrary to the concept of highest and best use. "The use that maximizes value represents highest and best use." *Id.* at 277.

Plaintiff's analysis determined that there is no market use for the nine percent of the building used for the eight large storage tanks. It is illogical to choose a "highest and best" use which renders nine percent of the property functionally obsolete when all of the property as of the assessment date was being used. It is likewise illogical for the appraiser to deduct as "superadequate" the extra high ceilings, the heavy steel and the thick concrete. Those very features were specifically designed to permit the use being made of the property, and they contribute in a positive way to the value of a marine fiber optic cable plant.

"The highest and best use of a special purpose property as improved is probably the continuation of its current use, if that use remains viable." *Id.* at 293.

There is no evidence in this case that, as of the assessment date, the current use was not viable or would not continue. To the contrary, the evidence indicated there was a strong active market and other plants had been constructed and larger business enterprises were acquiring and restructuring businesses in a positive, optimistic way. The court finds that the highest and best use of the subject property is as a plant for manufacturing marine fiber optic cable.

## REAL MARKET VALUE

The subject property is to be valued at its real market value.[2] ORS 308.205 specifies that:

---

[2]

"Real market value of all property, real and personal, as the property exists on the date of assessment, means the minimum amount in cash which could reasonably be expected by an informed seller acting without compulsion from an informed buyer acting without compulsion, in an arm's-length transaction during the fiscal year." ORS 308.205(1).

"(2)   Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue and in accordance with the following:

"* * * * *

"(c)   If the property has no immediate market value, its real market value is the amount of money that would justly compensate the owner for loss of the property."

To implement the above statute, defendant has adopted OAR 150-308.205-(A)(3) which provides:

"Especial property is property specially designed, equipped and used for a specific operation or use which is beneficial to only one particular user. This may occur because the especial property is part of a larger total operation or because of the specific nature of the operation or use, but in either case, the improvement's usefulness is designed without concern for marketability. Since a general market for the property does not exist, the property has no apparent immediate market value. Real market value shall be determined by estimating just compensation for loss to the owner of the unit of property through either the cost or income approaches, whichever is applicable, or a combination of both."

■    The court finds that the subject property is especial property within the meaning of the administrative rule. It was especially designed, equipped and used for a specific operation beneficial to a particular user. The marine fiber optic cable manufactured by plaintiff is not sold on the market to consumers. Rather, it is manufactured for use by a larger enterprise of which the subject property is only a part.

In addition, the plant was designed to meet plaintiff's specific needs, not to appeal to the marketplace. Since there are only two companies in the western hemisphere and four worldwide engaged in manufacturing marine fiber optic cable, there is no "immediate market" for plants manufacturing that product. It is possible that, if plaintiff wanted to sell, another participant in the industry would buy the plant to manufacture marine fiber optic cable. However, there is no evidence of any sales or offers to sell such properties. In the absence of an apparent immediate market, the administrative rule is applicable.

## APPROACH TO VALUATION

The administrative rule[3] indicates that the cost approach, the income approach, or a combination of those approaches may be used. It is undisputed that income data for properties used as marine fiber optic cable manufacturing plants is not available; thus the appraisers and the court must rely upon the cost approach. The principle of substitution holds that a purchaser would pay no more than the cost to build a new plant. Likewise, under Oregon's definition of real market value, it is reasonable to assume that a seller of an operating plant would accept no less than it would cost to purchase a replacement plant (less depreciation). Defendant's appraiser applied this basic principle.

■       Plaintiff contends that reliance upon the cost approach will result in a lack of uniformity. The contrary is true, as all marine fiber optic manufacturing plants will be uniformly assessed at cost. Under plaintiff's approach, all new specially designed plants would be valued for property tax purposes at a nominal value because there is no general market for such properties. This is inconsistent with the legislative intent and the constitutional concept of real market value.

## VALUE CONCEPTS

Plaintiff's argument that valuing the property based on its current use will result in "use value" raises a theoretical issue. ORS 308.205(1) uses the constitutional definition of real market value. This value is essentially that which is commonly referred to in the appraisal profession as "value in exchange" or "exchange value." It is the amount at which property will change hands in the marketplace. Although this concept is rife with questions and disputes under the best of circumstances,[4] it is widely used because of

---

[3] OAR 150-308.205-(A)(2)(d): "If there are no market transactions of property comparable to the subject, then it is still appropriate to use market value indications derived by the cost, income or stock and debt approaches."

[4]

"The use of 'market value' as the verbal basis for settling all varieties of legal disputes represents a uniformity of mere words rather than one of principle." I Bonbright, *Valuation of Property* 65 (1937).

its objectivity and market acceptance. It is to be distinguished from use value and investment value.

*"Use value is the value a specific property has for a specific use.* Use value focuses on the value the real estate contributes to the enterprise of which it is a part, without regard to the property's highest and best use or the monetary amount that might be realized on its sale." Appraisal Institute, *The Appraisal of Real Estate* 22 (10th ed 1992).

"Investment value" is the value a property has to a particular investor based on that investor's particular needs and circumstances.

■ Both use value and investment value consider subjective factors excluded from exchange value. For example, plaintiff's plant is only one of two in the United States and its location gives plaintiff a position on the Pacific Rim. Consequently, the plant could have greater value to plaintiff than its cost. Also, it could have greater value to plaintiff than it would have to another manufacturer of marine fiber optic cable. However, any increments of value attributable to plaintiff's business enterprise or its competitive advantages in the marine fiber optic cable industry must be ignored under ORS 308.205. This is because exchange value ignores any value attributable to the owner's position or attributes.

■ The difficulty of applying the concept of exchange value becomes acute when there are no exchanges. In those circumstances, assessors, the courts, and others who must establish such value do so by hypothesizing a willing seller and a willing buyer. There is danger in this practice. The finder of fact may slide into a determination of use value or investment value[5] or slip in the opposite direction and visualize a general market which has no use for the unique and different.

However, the real problem lies not with the concept of value but with the methods used to measure value. The three traditional approaches to value do not accurately measure exchange value in every circumstance. For example, assume an individual constructs a new office building for

---

[5] Bonbright notes that: "In the extreme cases, market value * * * becomes a mere synonym for value to the owner." I Bonbright, *Valuation of Property* 60 (1937).

$1,000,000. Due to poor design and execution, the $1,000,000 investment results in the building having an exchange value of only $500,000. If that building were taken in eminent domain, the owner is entitled to recover only $500,000 as just compensation. Society is not required to compensate the owner for poor judgment or poor execution of construction. However, if the building is a specially designed building and there is no market or income by which to determine its real market value, on a taking by the government, the owner will probably be compensated the cost of $1,000,000. This is not because the building is without flaws, but because cost is the only way the owner's loss can be measured.

In property taxation, the court seeks to determine the value at which property would change hands in the marketplace. In hypothesizing a transaction for the subject property,[6] the hypothetical willing seller would sell the subject property as a plant to manufacture marine fiber optic cable. The hypothetical willing buyer, applying the principle of substitution, will not pay more for the plant than is required to build a new one.

It is not unrealistic to hypothesize a sale of the subject property for its specialized use. While the evidence indicates that it is a small industry worldwide, it is possible for the plant to be sold to a competitor. The price would not include any value attributable to the seller's individual characteristics because the buyer would not be purchasing those attributes. Likewise, the price would not include any extra value due to the seller's special investment needs such as tax credits. While a seller may consider these facts in setting the price, the buyer will resist to the extent they are not the buyer's problems. In short, the hypothesized transaction results in an exchange value as opposed to a use value or an investment value.

Based on the evidence, the court finds the real market value of the buildings and structures (including the dock but excluding land) as of July 1, 1991, was $11,737,920. Defendant to recover costs and disbursements.

---

[6] Bonbright suggests the weaknesses of this approach are so great that, when the courts are faced with this prospect, they should try to "frankly adopt some other standard of value" rather than try to find market value. However, statutes control the values to be determined and the court must apply those statutes. I Bonbright, *Valuation of Property* 61 (1937).