IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| CAPITAL DEVELOPMENT COMPANY, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | TC-MD 110260C |
| | ) | |
| v. | ) | |
| | ) | |
| MARION COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

## I. INTRODUCTION

Plaintiff Capital Development Company (Plaintiff) appeals the real market value (RMV)

of six real property assessments for the 2010-11 tax year. The appeal is timely from an order of

the county board of property tax appeals. The properties at issue in this case (collectively, the

subject properties) are listed in the Marion County tax records as tax lots R335428 (parcel 1),

R335430 (parcel 2), R335431 (parcel 3), R335432 (parcel 4), R335433 (parcel 5), and R335434

(parcel 6).

Trial took place by telephone on Tuesday, January 24, 2012. Plaintiff was represented by

Christopher K. Robinson (Robinson) and Sharon Tuppan (Tuppan), Attorneys at Law.

Plaintiff's witnesses included C. Spencer Powell (Powell), Oregon State Certified General

Appraiser, Jack Gallagher III (Gallagher), Associate Vice President, NAI Norris, Beggs &

Simpson, and John Donaldson (Donaldson), Senior Vice President of Capital Development

Company. Defendant Marion County Assessor (Defendant) was represented by Scott Norris

(Norris), Assistant County Counsel. Appearing as a witness for Defendant was Tom Rohlfing

(Rohlfing), Senior Commercial Property Appraiser, Marion County Department of Taxation and

Assessment.

The court received and admitted into evidence Defendant's exhibit A, an appraisal of the subject properties prepared by Rohlfing, and Plaintiff's exhibits 1 through 6.

## II. STATEMENT OF FACTS

A.    *Subject property*

Plaintiff acquired the subject properties, consisting of 33.64 acres of undeveloped land, in 1991. (Ptf's Ex 1 at 7,9.) The subject properties are located on Stacy Allison Way NE in Woodburn, Oregon, and are referred to as the Woodburn Towne Center. (Ptf's Ex 1 at 2.) Woodburn is approximately 30 miles south of the city of Portland, which is the largest city (population) in Oregon, and 17 miles north of Salem, the state capitol. (Plaintiff's Exhibit 1 at 18.)

The subject properties are located adjacent to Interstate 5 (I-5), on the east side of the state's major north/south interstate freeway. However, the properties are not directly accessible from the I-5 interchange because they lie to the south of that freeway exchange "behind" (i.e. to the south of) a Super Wal-Mart store. (*Id*. at 21; Def's Ex A at 4.) Across the interstate are the Woodburn Company Stores (outlet stores) and a large Winco distribution center. (*Id*.) The parcels vary in size as follows: parcel 1, 5.93 acres; parcel 2, 4.99 acres, parcel 3, 7.56 acres; parcel 4, 6.55 acres; parcel 5, 6.83 acres, and; parcel 6, 1.78 acres. (Ptf's Ex 1 at 5; Def's Ex A at 3.)

The subject properties are zoned for general commercial use. (*Id*.) The properties are also within an Interchange Management Area Overlay (IMAO). (Ptf's Ex 1 at 22.) The purpose of the overlay "is to preserve the long-term capacity of Woodburn's I-5 Interchange with Highway 214, in coordination with the Oregon Department of Transportation (ODOT) because continued access to I-5 is necessary to attract and maintain basic employment within the

Woodburn Urban Growth Boundary (UGB)." (*Id*.) Powell states in his report that the above goals "are met by establishing trip generation budgets as called for in Transportation Policy H-7.1 of the Woodburn Comprehensive Plan," and that "[t]he parcel budgets are intended to be high enough to accommodate peak hour trips anticipated by the 2005 Woodburn Comprehensive Plan (WCP) and Transportation Systems Plan (TSP), but low enough to restrict unplanned vehicle trips that could adversely affect the interchange." (Ptf's Ex 1 at 22.) The parties agree that there are potential systems development charges (SDC's) of as much as $5,014,845, comprised of a base or "regular" SDC charge of $3,497 per peak hour trip (for a total of $3,808,233 for the subject properties) and an additional charge of $1,108 per peak hour trip for the IMAO zone (which amounts to an additional $1,206,612). (*See* Ptf's Ex 2.) They differ, however, on the appropriate treatment of those potential charges in valuing the subject properties.

The following table demonstrates the values of the properties as assessed and as contended by the parties:[1]

| Account # | AV Determined by BOPTA | RMV Determined by BOPTA | RMV Defendant's Appraisal | RMV Plaintiff's Complaint | RMV Plaintiff's Appraisal |
|---|---|---|---|---|---|
| R335428 | $1,693,340 | $2,066,490 | $1,627,359 | $968,666 | $1,390,000 |
| R335430 | $1,421,470 | $1,738,910 | $1,369,363 | $815,117 | $1,200,000 |
| R335431 | $2,136,030 | $2,633,730 | $2,074,061 | $1,225,125 | $1,900,000 [2] |
| R335432 | $1,850,050 | $2,281,110 | $1,796,376 | $1,063,409 | $1,660,000 |
| R335433 | $1,522,150 | $2,380,120 | $1,874,345 | $1,115,681 | $1,620,000 |
| R335434 | $503,470 | $620,790 | $488,874 | $294,030 | $550,000 |
| Total | $9,126,510 | $11,721,150 | $9,230,378 | $5,482,026 [3] | $8,320,000 |

[1] (Ptf's Compl, Ptf's Ex 1 at 42.)

[2] Plaintiff noted at trial a typographical error in its appraisal report. Plaintiff verbally corrected it from $190,000 to $1,900,000. (*See* Ptf's Ex 1 at 42.)

[3] Plaintiff's reported total. (Ptf's Compl.)

B.      *Parties' evidence*

      1) Plaintiff's case

At trial, Gallagher testified that the market for commercial real estate "eroded" from its height in 2007 to the assessment date of January 1, 2010. He attributed that erosion to a local, statewide, and national economic recession. Additionally, he testified that the property is located within an Interchange Management Area Overlay (IMAO) area and would be subject to systems development charges (development charges) if the property were developed. Gallagher testified that the subject property has been on the market since late 2009 but had received no offers. On cross examination, Gallagher stated that the asking price on January, 1, 2010, was $10.00 per square foot for parcel 6, and $8.00 per square foot for the other parcels. At the time Powell made his appraisal, parcel 6 was being "offered for $7.00 per square foot while the remaining five lots [were] offered at $5.00 per square foot." (Ptf's Ex 1 at 9.)

Donaldson testified that Plaintiff had not developed the subject properties because of the economic uncertainty and the competition from the nearby outlet stores. He further testified that an additional impediment to development of the property lay in the "development costs" associated with the IMAO, which, according to information he obtained from the city, would amount to $5,014,845.00. That information came from Dan Brown, Public Works Director, City of Woodburn. (Ptf's Ex 2.)

Donaldson further testified that Plaintiff had not developed the subject properties because of the interchange itself. Powell testified that the exits were insufficient to support current traffic and that at peak hours cars backed up to the highway. Donaldson testified that the interchange had received an "E," or failing grade, and that the State of Oregon, the City of Woodburn, and the federal government were all contributing funds to improve the interchange. He testified that

the planned interchange revision and improvement had been known for 20 years and that he believed that construction would begin soon. Donaldson testified that the original plan called for a full "cloverleaf" interchange but was subsequently downgraded to a partial clover. Powell's appraisal report indicates that the revised proposed interchange project would also include "widening and raising the profile of the existing bridge, widening both Oregon [Highways] 214 and 219, installing new 6-foot sidewalks and bicycle lanes, and adding a raised center median as well as new traffic signals." (Ptf's Ex 1 at 23.) Powell goes on to state that "[w]hile the project may help to improve access to the subject [properties], the overall uncertainty of its ramifications on the subject may detract [sic] potential buyers." (*Id*.)

Plaintiff's final witness, Powell, prepared the appraisal relied upon by Plaintiff. Powell inspected the property on October 6, 2011, and prepared the retrospective appraisal on November 7, 2011. (Ptf's Ex 1 at 7.) Powell has been a commercial/industrial appraiser for 41 years and has worked in the Salem area (which would encompass the town of Woodburn where the subject properties are located) for 40 of those years. Powell testified that the real estate market peaked in the first part of 2007 and that due to the collapse, the highest and best use (HBU) of the subject properties was to hold them for future commercial development. Powell identified five comparable sales in his appraisal that had an adjusted price per square foot ranging from a low of $5.25 to a high of $13.63. (Ptf's Ex 1 at 39-41.) Of those sales, Powell found two sales (comparables 3 and 4), a July 2010 sale of 16.62 acres in Albany, Oregon, located at 4250 Santiam Highway (Albany sale), and a December 2010 sale of 1.72 acres in Eugene, Oregon, located on Franklin Boulevard (Eugene sale) as "most similar" to the subject properties. (*Id*. at 40-41.) Those sales narrowed Powell's value range to between $8.89 per square foot and $10.33 per square foot. (*Id*. at 41.)

Powell concluded that his comparable sales indicated a value of $9 per square foot for five of the six lots (parcels 1 through 5) and $11 per square foot for the smaller parcel 6. (*Id*. at 42.) Powell rounded the resulting numbers to arrive at an indicated market value under the sales comparison approach of $13,320,000.[4] (*See id*.) Powell then deducted the potential development costs of $5,014,845 and rounded again to arrive at a final estimated value of $8,320,000.

2) Defendant's case

Defendant's witness, Rohlfing, prepared the appraisal relied upon by Defendant. Rohlfing testified that the HBU of the subject properties was to hold them for future commercial development. Rohlfing identified seven comparable sales in his appraisal that had an adjusted price per square foot of between $7.70 (comparable 1) and $19.29 (comparable 5). (Def's Ex 1 at 8.) Of those sales Rohlfing identified three as most similar to the subject properties. The first of the three sales (comparable 2), at $8.99 per square foot, occurred on April 20, 2007, and was comprised of 13.10 acres immediately adjacent to parcel 1 of the subject properties (adjacent property sale). Plaintiff's appraiser Powell used the same sale in his report as comparable 1. Rohlfing's second sale (comparable 3), at $9.50 per square foot, occurred on April 1, 2010, and was comprised of 0.79 acres of land located in Woodburn, Oregon, at 2050 Progress Way (Progress Way sale). The third sale (comparable 4), at $10.38 per square foot, occurred on April 7, 2010, and was comprised of 2.45 acres of land located in Woodburn, Oregon, at 1395 Mt. Hood Ave (Mt. Hood sale).

Rohlfing concluded that his comparable sale 2 was the best indicator of value for the subject properties and that a market adjustment was necessary. (Def's Ex A at 13.) He did not,

---

[4] Powell rounded the value of parcel 1 down by almost $25,000. He rounded the values of the remainder of the parcels to the nearest $5,000.

however, adjust the adjacent property sale price to reflect the difference in size between the parcels. Rohlfing surmised that, due to the depressed real estate market, it would be necessary to make a downward adjustment to that adjacent property sale price to determine the real market value of the subject properties. (Def's Ex A at 3-14.) He thus applied a 30 percent downward adjustment to his $9.00 "land price per square foot of the subject properties prior to market adjustment" to arrive at an adjusted real market value of $6.30 per square foot, or $9,230.408 in total.

On cross examination, Rohlfing testified that the development charges are real costs borne by all developers in the IMAO. However, he testified that the potential development charges would be reflected in the purchase price paid for any property within the IMAO. The parties disagreed about the effect of the development charges of the real market value of the subject properties and when the charges were first put into place.

Plaintiff contends that the real market value of the subject properties as of the assessment date was $8,320,000. Defendant contends that the real market value of the subject properties as of the assessment date was $9,230,408. As can be seen, the parties ultimately differ in their opinion of value by approximately $910,000.

### III. ANALYSIS

The issue before the court is the Real Market Value (RMV) of the subject property for the 2010-11 tax year.

In Oregon, all real property "not exempt from ad valorem property taxation or subject to special assessment shall be valued at 100 percent of its real market value." ORS 308.232.[5]

///

---

[5] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2009.

RMV is defined by statute as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1).

That statute further provides that RMV "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue and in accordance with [certain statutorily enumerated principles]." ORS 308.205(2). Those statutory principles that must guide the Department in its promulgation of valuation methods and procedures require an RMV determination based on "[t]he amount a typical seller would accept or the amount a typical buyer would offer that could reasonably be accepted by a seller of property[,]" and require that "[a]n amount in cash shall be considered the equivalent of a financing method that is typical for a property." ORS 308.205(2)(a), (b). Finally, the statute provides that property without an immediate market value shall have an RMV "that would justly compensate the owner for loss of the property." ORS 308.205(2)(c).

The Department's rule, in turn, generally provides for the valuation of all real property based on the consideration of the three standard approaches to valuation. OAR 150-308.205-(A)(2)(a). Those approaches are the sales comparison approach, the cost approach, and the income capitalization approach. *Id.*; *cf.* Appraisal Institute, *The Appraisal of Real Estate* 130 (13th ed 2008). The rule does not require the use of all three approaches, but merely the consideration thereof.

The value of property is ultimately a question of fact. *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001). The party seeking affirmative relief has the burden of proof and, initially, the burden of going forward with the evidence. ORS 305.427. The court "has the responsibility of making an original, independent, and *de novo* determination of value." *Chart*

Development, 16 OTR at 11 (citing *Mid Oil Co. v. Dept. of Rev.*, 297 Or. 583, 588, 686 P.2d 1020 (1984).

A.    *Highest and best use*.

Implicit in any determination of RMV of land is the concept of highest and best use (HBU). RMV presumes that the market will seek the maximum economic benefit from property. *Wild Oats Markets Inc., v. Clackamas County Assessor*, TC-MD 070499C (Control), WL 2206785 at *3 (June 2, 2010). Highest and best use can be defined as, "the reasonably probable and legal use of vacant land * * * that is physically possible, appropriately supported, and financially feasible, and that results in the highest value." OAR 150-308-205-(A)(1)(e); *see also Appraisal of Real Estate* at 277-78. HBU is generally the starting point for any appraisal. A highest and best use analysis assists the appraiser "to interpret[] the market forces that affect the subject property and identif[y] the use or uses on which the final opinion of value [should be] based." *Id*. at 139. "An appraiser determines the highest and best use of property by weighing market demand for the uses, products or services the property is designed to provide. That analysis focuses on the uses to which a property can most profitably be put." *STC Submarine, Inc. v. Dept. of Rev.*, 13 OTR 14, 18 (1994).

Both appraisers concluded that the highest and best use of the property as of the assessment date was to hold the property for future commercial development . (Ptf's Ex 1 at 36; Def's Ex 1 at 7.) Plaintiff's appraiser Powell's testimony and information in his appraisal report that led him to conclude that the highest and best use was *future* commercial development included marketability factors such as the limited number of prospective buyers of such a large property and the uncertainty and limited availability of capital for acquisition and development, coupled with "uncertainty among prospective buyers due to the I-5 Interchange Plan as well as

traffic restrictions and service [system] development charges imposed under the IMAO ordinance." (Ptf's Ex 1 at 36.) Gallagher testified that the market "eroded" from its height in 2007 through 2010, and that real estate transactions slowed down dramatically during that time. He stated that the economy locally, statewide, and nationally was in recession. Powell stated that the economic health was tied to employment.

Defendant's appraiser Rohlfing testified that many commercial uses were permissible but not financially feasible. Thus, while Rohlfing believes that likely uses for the subject property include a hotel, possibly office space if the user required freeway visibility and/or easy access, large retail, and an automobile dealership, Rohlfing testified on cross-examination that financial feasibility factors rendered immediate development and "speculative." Rohlfing explained in his appraisal that HBU on the assessment date was inextricably woven with the economic climate:

> "Based upon analysis of the market as of January 1, 2010 the current financial feasibility of many potential uses is in question. A large part of this is the ability to attract the capital for a project. The number of immediate uses that are currently feasible are limited in the current market and depend heavily on capital."

(Def's Ex A at 7.) Rohlfing acknowledged in his appraisal that there was a "change" in market conditions "since early 2007 when sale #2 closed. We know that local property development, especially retail development, has slowed." (*Id*. at 13.)

Based on the collective opinions of the parties' appraisers, the court accepts that highest and best use for the subject properties on January 1, 2010, was to hold the properties for future development.

B.    *Land value*

OAR 150-308-205-(A)(2)(a) requires Defendant to consider three valuation approaches: (1) sales comparison, (2) cost, and (3) income. Because the land was undeveloped, Defendant and Plaintiff agree that neither the cost nor the income approach is appropriate in valuing the

subject properties. (*See* Ptf's Ex 1 at 38; Def's Ex A at 14.)  The court agrees with the parties that the comparable sales method is the most appropriate method for valuing the subject properties as of the assessment date.

C.       *Sales comparison approach*

Both appraisers relied on the sales comparison approach to value the subject properties. The sales comparison approach requires an appraiser to determine the value of property, "by analyzing closed sales, listings, or pending sales of properties that are similar to the subject property." *Appraisal of Real Estate* at 297.  The comparison requires finding properties of similar size and use that have been recently sold, were listed for sale, or under contract to be sold.  *Id.*  The sales comparison approach necessarily relies on the principle of substitution; that is, "that the value of the property tends to be set by the price that would be paid to acquire a substitute property of similar utility and desirability within a reasonable amount of time."  *Id.* at 298-99.

Powell identified five comparable sales in his appraisal.  (Ptf's Ex 1 at 39-41.)  He determined that the Albany sale at $10.33 per square foot (adjusted) and the Eugene sale at $8.89 per square foot (adjusted) were the most similar to the subject property.  (*Id*. at 41.)  Powell settled on an estimated value per square foot of $9 for all but one of the parcels (parcel 6, a 1.78 acre lot, which he felt at a slightly higher value of $11 per square foot).  (*Id*. at 42.)  Rohlfing identified seven comparable sales in his appraisal.  (Def's Ex A at 8.)  He determined that the sale of the adjacent property  (comparable 2), at $8.99 per square foot, was the single best indicator of value for the subject property.  (*Id*. at 13.)  As indicated above, Powell included that

/ / /

/ / /

sale as his comparable 1. (Ptf's Ex 1 at 39.) Thus, the parties both essentially begin with an unadjusted price per square foot of $9.[6]

Plaintiff's appraiser subtracted the $5,015,845 in system development charges (SDCs) from his initial unadjusted value estimate of $13,320,000 ($12,470,000 for parcels 1 through 5 and $850,000 for parcels 6), and arrived at a final indicated value of $8,320,000 (rounded). (Id. at 42.) Defendant's appraiser Rohlfing used $9 per square foot for all of the properties and applied a 30 percent market adjustment, to arrive at a value per square foot of $6.30. (Def's Ex A at 14.) Rohlfing's 30 percent was based on three studies of listing data compiled by three different organizations. (Id. at 13-14.) One of those studies, conducted by the Mortgage Bankers Association, showed an average decrease of 34.5 percent in sales prices for properties and portfolios of greater than $5,000,000. (Def's Ex 1 at 14.) Defendant offered no explanation as to why a 30 percent adjustment was more appropriate than the 34.5 percent adjustment determined by the Mortgage Bankers Association study. A falling tide lowers all boats, but not necessarily uniformly. *See, e.g.*, *Appraisal of Real Estate* at 333 ("A recession tends to deflate all real estate prices, but specific property types or submarkets may be affected differently.") Gallagher's testimony confirmed that the local commercial real estate market was especially hard hit. In any event, Rohlfing's final value is $9,230,000 (rounded). (*See* Def's Ex A at 14.)

Robinson, Plaintiff's legal representative, suggested in closing that the court could use a value of $8 per square foot based on the earlier list price for most of the lots and apply Defendant's 30 percent market adjustment, which would result in a value estimate of $8,206,000 (rounded). Alternatively, the court could deduct the lesser of the two SDC charges of

---

[6] Plaintiff's appraiser's slightly higher $11 per square foot value estimate for the 1.78 acre parcel (comparable 6) resulted in an estimated value of $850,000 (rounded). At $9 per square foot the value estimate for that lot would have been $700,000 (rounded).

$1,206,612 for the additional freeway overlay which Rohlfing testified on cross-examination was not necessary because he "believed" that cost was factored into his best comparable that sold in April 2007, although he also acknowledged on cross-examination that he was not sure when the SDCs became applicable or, as Donaldson testified, they did not "come on" until sometime in 2008. Subtracting the $1,206,612 from Defendant's $9,232,000 value estimate results in a value of $8,025,000 (rounded).

The court has the jurisdiction to determine the RMV of property based on the evidence provided by the parties, without regard to the values pleaded by the parties. ORS 305.412. Taking into account the adjacent property sale and the adjustment for the market conditions, the court finds that Plaintiff presented the more persuasive evidence of market value at $8,320,000 (rounded). The court is persuaded by that number, at least in part, based upon the determination that the market would consider the additional looming SDC charges for the freeway overlay of approximately $1,207,000, and that if that figure were subtracted from Defendant's value estimate of $9,232,000, the resulting value estimate would be $8,025,000 (rounded).

The resulting real market values of the properties is as follows:

| Account # | RMV of Property |
|-----------|-----------------|
| R335428   | $1,390,000      |
| R335430   | $1,200,000      |
| R335431   | $1,900,000      |
| R335432   | $1,660,000      |
| R335433   | $1,620,000      |
| R335434   | $550,000        |
| Total     | $8,320,000      |

Now, therefore, the court finds that the real market value of the subject properties as of the applicable assessment date of January 1, 2010, was $8,320,000 as set forth above, and that Defendant shall adjust the assessment and tax rolls accordingly.

### III.  CONCLUSION

After careful and painstaking evaluation of the evidence, the court concludes the real market value of the subject properties collectively was $8,320,000 as of January 1, 2010.

IT IS THE DECISION OF THIS COURT that, for the 2010-11 tax year, the real market value of Plaintiff's property, identified in the Marion County Assessor's records as tax lots R335428, R335430, R335431, R335432, R335433, and R335434 was $8,320,000.

Dated this ____ day of September 2012.

DAN ROBINSON
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Dan Robinson on September 11, 2012. The Court filed and entered this document on September 11, 2012.*