IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

HELMS DEEP LLC,                          )
                                         )
                 Plaintiff,              )      TC-MD 190153N
                                         )
          v.                             )
                                         )
MULTNOMAH COUNTY ASSESSOR,               )
                                         )
                 Defendant.              )      **DECISION**

Plaintiff appealed the value of property identified as Account R171366 (subject property) for the 2018-19 tax year. A trial was held on November 3, 2020, in the courtroom of the Oregon Tax Court. Alex C. Robinson, an Oregon attorney, appeared on behalf of Plaintiff. Richard P. Herman (Herman), MAI, FRICS, Oregon Certified Appraiser, testified on behalf of Plaintiff. Carlos A. Rasch, Senior Assistant County Attorney, appeared on behalf of Defendant. Scott Elliott (Elliott), Real Property Appraiser 3, and Kevin Biggers (Biggers), Commercial Appraiser 2, testified on behalf of Defendant. Plaintiff's Exhibit 1 and Defendant's Exhibit A were received without objection.

## I. STATEMENT OF FACTS

A.     *Subject Property Description and Use as of Assessment Date*

Herman testified that the subject property was originally an industrial property; it is an 11,000 square foot site that previously included two warehouses built in 1952. (*See* Ex 1 at 25; Ex A at 3.) Plaintiff bought the subject land for $1,950,000 in June 2014. (Ex 1 at 7.) In 2017, Plaintiff "repurposed" the subject property into a unique structure designed by Portland's Skylab Architecture, now known as the "Bodecker building." (Ex 1 at 25, 40; Ex A at 3, 25-26.) "The roof was removed from the west structure and the exterior walls from the east structure to modify

DECISION  TC-MD 190153N                                                                          1

the space into a geometric pinwheel framework." (*Id.*) "Materials from the existing warehouse structure were repurposed into new components of the creative house." (Ex A at 27.)

The subject is three stories with 14,095 square feet total, of which 7,769 square feet is heated living space.[1] (Ex 1 at 40.) The first level also includes 6,326 square feet of "warehouse with a skateboard pool." (*Id.*) The subject's indoor features include an entry foyer, kitchen, dining room, conference rooms, "open platform utility/work area," "professional recording studio," "DJ/sound booth, skateboard park," bar, open seating areas, library, "alcove workspace with built-in desks and cabinetry," lounge, two bedrooms, four "built-in bunk beds," two full bathrooms, and three half bathrooms. (*Id.* at 40-41.) Its outdoor features include a courtyard, sandy beach with fire pit, stormwater catchment, bamboo garden, mini golf course, a parking area with a music stage, and rooftop patios with decking, a seating area, a "playground slide," and eco-gardens. (*Id.*; Ex A at 3, 27.) The work throughout features high-end finishes and unique architectural details. (Ex 1 at 41; Ex A at 26.)

The subject "was specifically conceived of, and designed with the express purpose of creating a custom artist's collaborative, performance and event space." (Ex A at 3.) It is a "collaborative artistic area that brings together musicians, skaters, artists and designers." (*Id.* at 25.) The subject's design is based on "the mission and vision of the NM Bodecker Foundation," an organization formed in 2017 to organize workshops, mentor, and offer scholarships to "empower creative youth to imagine their artistic, educational and professional dreams." (*Id.* at 25-26.) The subject provides "an extraordinary and energetic gathering place for workshops, mentoring, and collaboration." (*Id.*) It was "[p]urposely built as a space for playing and making,

---

[1] Defendant determined the subject property is 12,308 square feet with 4,389 square feet of "garage area." (Ex A at 25.)

a space created for imaginative exploration." (*Id.* at 26.) The bedrooms were "designated for artists in residence as a 'crash pad' during their recording sessions." (*Id.* at 26-27.)

The subject property is located in a "Commercial Mixed Use 2" zone within the Alphabet District of Northwest Portland surrounded by townhome and condominium developments, apartments, single family residences, warehouses, general commercial, office and light industrial uses. (Ex 1 at 34, 42; Ex A at 3.) Nearby development in progress as of the assessment date included several apartment buildings adding over 1,200 new units, creative office space with ground floor retail, and flexible workspace. (Ex 1 at 34.) Herman testified that the "close-in Northwest Portland market" is characterized by high demand for all property types.

The subject property's occupancy permit issued April 26, 2017, "restricts the property to residential use," which "allows for congregate living facilities of no more than 16 non-transient occupants or up to 10 transient occupants." (Ex 1 at 40.) "Code Unlimited" analyzed "how to best obtain building code compliance relative to the desired form of occupancy and the development of a strategy to retrofit the building to operate under two additional occupancy categories, business use and assembly/gathering." (*Id.* at 41.) "The cumulative cost of retrofitting the subject property in order to qualify for all three categories of occupancy is $2,043,616." (*Id.* at 45.) "In November 2019, an application was submitted for a change in occupancy from a residential R-3 to an arts education center." (*Id.* at 41.) Biggers testified that a buyer as of January 1, 2018, would consider changing the occupancy certificate.

B.    *Highest and Best Use*

The appraisers generally agreed that, as vacant, the subject would likely be developed as a mixed-use property with ground-floor retail, parking, and apartments, consistent with nearby development. (*See* Ex 1 at 44 (concluding that the subject site "would support more traditional

DECISION  TC-MD 190153N                                                                                                    3

commercial or residential uses"); Ex A at 36 (concluding "that some type of high-rise commercial use is the highest and best use of the site as vacant[,]" in particular, a mixed-use with multi-family primary use would yield the highest value).)

The appraisers differed in their conclusions of the highest and best use of the subject as improved. Herman testified that the subject was built for very specific needs and desires; it was not intended to be resold as profitable. (*See* Ex 1 at 5.) He defined the "appraisal problem" as determining how to modify the subject to be marketable. Biggers agreed that the subject was built without concern for marketability but testified that the subject was being used for its intended purpose, providing skate and music programs for kids.

Herman considered the value of the subject as residential property, ultimately concluding that was not its highest and best use.[2] (Ex 1 at 45-53.) In the market for homes over $1 million, he found 208 sales in 2017 with a median sales price of $1.3 million. (Ex 1 at 36.) Narrowing the search to the subject's zip code, he found 29 sales in 2017 with a median price of $1.25 million. (*Id.*) Herman identified seven residential sales ranging from $1.5 million to $1.745 million, concluding that the subject would likely command a value of $1.7 million in the residential market. (*Id.* at 45-47, 52.) That is less than the subject's value after retrofitting for mixed commercial or office use. (*Id.* at 52-53.)

Herman concluded that the subject's highest and best use as improved was as a single-tenant or multitenant mixed-use commercial property. (Ex 1 at 44.) He determined "that the value of the improvements [at that use] substantially exceeds the value of the underlying site (based upon an analysis of recent relevant land sales)." (*Id.*) Herman testified that the primary

---

[2] Elliott testified that he inspected the subject property and initially attempted to perform a residential market analysis but found no comparable sales.

tethering point is the certificate of occupancy; it was restricted to residential as of January 1, 2018, so it did not allow the full potential of the subject property. He testified that the subject could support specialty professional offices in finance, law, counseling, or creative fields. It has the hallmarks of "trophy property" that is memorable.

Biggers agreed that, as improved, the subject property's value exceeded the land value. (Ex A at 37.) He determined that the subject's current use was its highest and best use:

> "The current first generation improvements are functioning as a purposely-designed artist's creative facility, with no functional obsolescence. There is no suggestion of inadequacy of the structure. To the contrary, it has been specifically designed for the purpose it continues to be used for. Accordingly, the existing improvements represent the most productive use of the site, as intended."

(*Id.*) Biggers further explained that "the subject property was developed void of any market influences; it was designed for a specific vision and function. It was never conceived to be competitive in the eyes of market participants nor was it conceived as an income-producing venture." (*Id.*) Based on that analysis, he concluded "that the subject property is a special-use property and was developed for a singular purpose and use." (*Id.*)

Biggers testified that he determined the subject was special purpose because it is a unique property with no comparisons. He gave some other examples of special purpose properties: a firefighter training building that he appraised in King County, which a buyer would likely scrape; the Multnomah County courthouse, which is now being converted to office space; the Portland art museum; and the Cowboys stadium. Biggers testified that the current user's intentions are relevant to highest and best use to the extent they help define the highest and best use as special purpose property. Most special purpose property is not at its highest and best use. Biggers testified that some properties are overbuilt for the market, such as a corporate headquarters, characterizing such use as "first generation." The second generation use typically

sells for less, and there might also be a third generation use that sells for even less. Biggers typically values the first generation use at cost because the second generation use represents a different use and market. In that respect, he conceded that a market exists for the subject.

C.      *Plaintiff's Valuation: Conversion to Creative Office, Sales Comparison Approach*

Herman identified five comparable sales of creative office space that ranged from 4,026 to 26,022 square feet rentable area. (Ex 1 at 55.) They were built between 1925 and 1987 and were all average quality and condition. (*Id.*) Herman acknowledged they were all "somewhat inferior to the subject qualitatively." (*Id.* at 59.) He testified that he did not make any adjustments; rather, the took differences into account in selecting comparable sales. Herman found that the sales indicated a value range of $290.14 to $304.24 per square foot, after rejecting the high (sale 5) and low (sale 1), concluding a value of $325 per square foot for $4.6 million for the subject property before the cost of code compliance retrofitting. (*Id.*) After subtracting the cost of retrofitting, Herman concluded an as-is value of $2,556,384. (*Id.* at 45.)

Defendant questioned Herman's value conclusion of $2,556,384 in light of the tax roll land value of approximately $2 million, suggesting the improvements are worth only $556,000. Herman did not think a land value analysis was relevant because the subject is improved.

Herman testified that he did not pursue the cost approach because the actual costs were driven by the desires of the owner rather than market considerations. Cost was irrelevant to the subject property's owner. He was building the property of his dreams as was not concerned about money. The "functional replacement" of the subject property would be a fraction of its actual cost. Herman testified that the subject property was superadequate, as demonstrated by the difference between the actual cost and the market value under the sales comparison approach. He did not perform an income approach because he found that most comparable properties were

owner-occupied rather than leased, though he acknowledged some were leased, typically under a sale and leaseback. None mirrored the functionality of the subject property.

D.      *Defendant's Valuation: Special Purpose Property, Cost Approach*

Based on his conclusion that the subject property was special purpose property, Biggers valued it using the cost approach, finding the sales comparison and income approaches to be inapplicable. (Ex A at 43-44.) To value the subject property using the cost approach, he began by determining the land value. Biggers identified four comparable land sales indicating an adjusted range of $188 to $227 per square foot. (*Id.* at 42.) He concluded a value of $210 per square foot or $2,310,000 for the subject property land. (*Id.*)

Biggers used actual costs to determine the value of the subject improvements because Marshall and Swift or similar cost estimators were too difficult to use for such a complex and unique building.[3] (Ex A at 45.) The actual costs to construct the subject improvements were $10,300,000, however Biggers relied on the "insurance replacement cost" of $6 million, noting that ORS 308.205(c) refers to the just compensation value and "the insurance replacement cost * * * is what the owner would be compensated for total loss of the improvements." (*Id.* at 46.) Adding that to the land value, he concluded a total value of $8,310,000. (*Id.* at 47.) Biggers declined to subtract any amount for obsolescence, explaining that "finding evidence in the market to support appropriate adjustments for obsolescence would be extremely difficult and completely subjective." (*Id.* at 46.) He testified that any measurement of obsolescence must relate to the market and there is no market for the subject.

///

--------

[3] He explained that the complex shape and "[t]he fact that portions of the structure were originally constructed at different times, the varied materials and different construction types, and the number of custom, one-of-a-kind features all lead to a potentially murky conclusion." (Ex A at 45.)

E.     *Tax Roll and BOPTA Values*

The subject property's 2018-19 tax roll real market value was $17,236,430 and its maximum assessed value was $7,631,369. (Compl at 2.) The Board of Property Tax Appeals reduced the real market value to $9,100,000 and the maximum assessed value to $4,946,860.[4] (*Id.*) Both the tax roll and BOPTA listed the subject property land value as $2,018,130. (*Id.*) Plaintiff seeks a real market value of $2,556,500 and Defendant concluded a real market value of $8,310,000, with $2,310,000 allocated to the land. (Ex 1 at 2; Ex A at 47.)

## II. ANALYSIS

The issue before the court is the 2018-19 real market value of the subject property.[5] Real market value is defined as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1).[6] The assessment date for the 2018-19 tax year was January 1, 2018. *See* ORS 308.007; 308.210. Real market value must "be determined by methods and procedures in accordance with rules adopted by the Department of Revenue." ORS 308.205(2). "If the property has no immediate market value, its real market value is the amount of money that would justly compensate the owner for loss of the property." ORS 308.205(2)(c).

In accordance with ORS 308.205(2), the Department of Revenue has promulgated an administrative rule prescribing approaches to value and defining terms used in the statute. *See*

---

[4] Because the subject property improvements were new as of January 1, 2018, a reduction in the improvements real market value yields a reduction in maximum assessed value.

[5] The subject property's 2018-19 exception real market value is at issue, but the parties did not explicitly focus on that issue at trial. A reduction in the improvements real market value yields a reduction in exception value.

[6] The court's references to the Oregon Revised Statutes (ORS) are to 2017.

OAR 150-308-0240.  To determine real market value, the department requires consideration of three approaches to value: the cost approach; the sales comparison approach; and the income approach.  OAR 150-308-0240(2)(a).  Even though all three approaches must be considered, all three may not be applicable to the valuation of the subject property.  The applicable approach to value is a question of fact determined on the record.  *Pacific Power & Light Co. v. Dept. of Revenue*, 286 Or 529, 533, 596 P2d 912 (1979).

For property with no immediate market value under ORS 308.205(2)(c), the department has defined "just compensation" as "the amount of compensation for a property that an owner would expect for the taking through condemnation of their property.  Just compensation is the real market value of the property at its highest and best use."  OAR 150-308-0240(1)(f).  "If there are no market transactions of property comparable to the subject, then it is still appropriate to use market value indications derived by the cost and income approaches."  OAR 150-308-0240(2)(f).  The rule further describes one category of property – special purpose property – which may have "no immediate market value" at its highest and best use because no market sales data exists.  *See* OAR 150-308-0240(3)(c).[7]  "Where there is no immediate market value, real market value is determined by estimating just compensation for loss to the owner of the unit of property through either the cost or income approaches, whichever is applicable, or a combination of both."  OAR 150-308-0240(3)(c).

As the party seeking affirmative relief, Plaintiff bears the burden of proof by a preponderance of the evidence.  ORS 305.427.  "Preponderance of the evidence means the

---

[7] "Special purpose property is property specially designed, equipped, and used for a specific operation or use.  This may occur because the special purpose property is part of a larger total operation or because of the specific nature of the operation or use."  OAR 150-308-0240(3)(a).  "Some, but not all, special purpose property may be designed without concern for marketability."  OAR 150-308-0240(3)(b).

greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). Because real market value is at issue, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

A.       *Highest and Best Use*

Highest and best use is "the first issue"; "the market value of the property at that use" is "the second issue." *Freedom Federal Sav. and Loan Ass'n v. Dept. of Rev.*, 310 Or 723, 727, 801 P2d 809 (1990). " 'Highest and best use' means the reasonably probable use of vacant land or an improved property that is legally permissible, physically possible, financially feasible, and maximally productive, which results in the highest real market value." OAR 150-308-0240(1)(e). "Determining highest and best use for the unit of property is necessary for establishing real market value." OAR 150-308-0240(1)(i). The highest and best use may "result from retaining, altering, or ceasing the integrated nature of the unit of property." *Id.*

"A highest and best use analysis 'is an economic study of market forces focused on the subject property.' " *STC Submarine, Inc. v. Dept. of Rev.*, 13 OTR 14, 18 (1994) (quoting Appraisal Institute, *The Appraisal of Real Estate* 276 (10th ed 1992). "An appraiser determines the highest and best use of property by weighing market demand for the uses, products or services the property is designed to provide." *Id.* "Highest and best use is not determined by ascertaining whether there are market transactions indicating a demand for a property. That analysis is too general." *Id.* Rather, the focus is "on the uses to which a property can most profitably be put." *Id.*

In making this economic analysis, the court considers the use of the property as of the assessment date, including the "viability of taxpayer's entire operation." *See STC Submarine*,

320 Or 589, 593 n6, 890 P2d 1370 (1995) (concluding that the current use of a marine fiber optic cable manufacturing plant was its highest and best use based on evidence of "a strong active market for marine fiber optic cable"); *Freedom Federal*, 310 Or at 726 (concluding that current use of financial institution's headquarters was its highest and best use. "Although the savings and loan industry may have been weak, *on* the assessment dates taxpayer fully occupied the property as its headquarters. Whether the highest and best use would continue to be a financial institution's headquarters *after* the assessment dates is irrelevant." (Emphasis in original.)).

"[W]hether an immediate market exists for a building at a particular use is separate * * * from the question of whether that use is highest and best." *Freedom Federal*, 310 Or at 726-27 (rejecting taxpayer's argument that the lack of an immediate market for the property as a financial institution's headquarters required valuing the property at an alternative use for which an immediate market existed); *see also STC Submarine*, 320 Or at 593 ("The nonexistence of an immediate market for a marine fiber optic cable manufacturing plant on the assessment date does not necessarily mean that taxpayer's existing use of the building and structures is not the highest and best use.").

In some instances, the lack of an immediate market for property is explained by the nature of the property and market forces. *See Freedom Federal*, 310 Or at 728 (finding that comparable sales were lacking because "financial institutions do not usually buy their headquarters buildings, but instead build them to their own specifications"); *see also STC Submarine*, 13 OTR at 20 (finding a lack of discrete market sales of marine fiber optic cable manufacturing plants because there were only four such plants in the world). The Tax Court further illustrated this point with an example of a single hotel operating in a small city:

> "If there are no comparable sales to indicate that the hotel would sell as a hotel, plaintiff's theory would suggest that because a hotel can be used as apartments, its

highest and best use is for apartments. However, if there is market demand for hotel services the highest and best use is for a hotel, not apartments."

*Id.* at 18.

Similarly, the fact that a property is unique or specialized does not necessarily mean that its current use is not its highest and best use. *See STC Submarine*, 13 OTR at 18-19 (quoting *Appraisal Institute*, The Appraisal of Real Estate at 277, 289) ("a property's highest and best use may be unusual or even unique.' * * * Valuing this unique property as if it were generic is contrary to the concept of highest and best use."). The question is whether those unique and special features contribute to the property's highest and best use. *See STC Submarine*, 320 Or at 596 (rejecting argument that the department erred by failing to deduct for superadequacies because the special features were designed to accommodate the property's highest and best use, thereby increasing its market value).

The key question in this case is the highest and best use of the subject property as of January 1, 2018. Plaintiff concluded that its highest and best use was to reconfigure the subject into creative office space, whereas Defendant concluded that the subject's current use[8] was its highest and best use. The test of whether the subject's current use was economically viable on the assessment date is difficult to apply here because the subject was built for the purpose of operating an artist's collaborative, performance, and event space, with the goal of furthering the mission of an arts-focused nonprofit organization by creating a space for workshops and youth programs. It does not appear that the subject was intended to be used as part of a business operation. The fact that the subject was being used for its intended purpose on the assessment

---

[8] It is worth noting here that the evidence presented indicates the subject may not have been fully operating at its intended use as of January 1, 2018, because Plaintiff had not yet completed the retrofitting required to add two additional certificates of occupancy: business use and assembly/gathering. Defendant's description of the subject's highest and best use includes performances, events, and workshops, each of which likely required those additional certificates of occupancy. Nevertheless, the court here uses the term "current use" for consistency.

date supports the conclusion that its existing use was its highest and best use. Furthermore, both appraisers agreed that the subject was designed for a unique and specific purpose.

In concluding that the subject property's current use was not its highest and best use, Herman focused on the lack of an immediate market for the subject as well as its many unique features designed to fulfill Bodecker's artistic vision and constructed without regard to cost. As with corporate headquarters, it may be that the subject is the type of property that is typically constructed to the owner's specifications, rather than purchased. Given that the subject is highly unique, it is not surprising that neither party found any comparable sales. Biggers persuasively testified that the subject was functioning at its "first generation" use as of January 1, 2018. Herman's analysis of converting the subject to creative office space likely represents a second generation use if the current use were no longer viable. Ultimately, Plaintiff bears the burden of proof and the court finds that Plaintiff did not present sufficient evidence to support a finding that the subject's highest and best use as of January 1, 2018, was conversation to creative office space, particularly in light of the fact that the subject was being used for its intended purpose.

B.      *Value of the Subject Property at its Highest and Best Use*

Having found that the subject property's highest and best use as of January 1, 2018, was its current use as an artist's collaborative, performance, and event space, the court turns to the subject's value at that use. Because Herman valued the subject at an alternate use, the court is left only with Biggers' appraisal report, which valued the subject using the cost approach and a "just compensation" standard under ORS 308.205(2)(c). As discussed above, the just compensation standard is appropriate when a property has no immediate market value. The parties agreed that there was no immediate market for the subject at its current use as of the

assessment date.[9]  Accordingly, the court finds that the just compensation standard is appropriate

here and the cost approach is one of the approved methods for determining that value.[10]

The "just compensation standard is premised on the concept of 'value in exchange,' [but]

it looks at value from the seller's perspective, rather than the buyers." *Les Schwab Tire Centers*

*of Oregon v. Crook County Assessor*, 14 OTR 588 at *3 (1999) (citing *Truitt Brothers, Inc. v.*

*Dept. of Rev.*, 10 OTR 111 (1985)).  The court in *Les Schwab* found there was no immediate

market for "1,600,000 square feet of mostly warehouse in a small city in central Oregon" that

"were designed and built without consideration for marketability" so the just compensation

standard was appropriate.  *Id.* at *3, *6 (internal quotation marks omitted).)  In determining the

value under the cost approach, the court used the replacement cost method, considering excess

building, labor, and equipment costs due to functional obsolescence associated with the

inefficient layout of the property, and made an appropriate deduction.  *Id.* at *6.

Biggers concluded a just compensation value of $8,310,000 based on the insurance

replacement cost for the subject property.  That amount is less than the actual costs incurred to

build the subject improvements: $10,300,000.  This court typically distinguishes between the

concepts of "real market value" and "insurance value."  *See Brummell v. Dept. of Rev.*, 14 OTR

303, 307 (1998) ("[t]he concept of real market value is a distinct concept, separate from other

measures of value such as investment value, insurance value, or replacement value"); *see also*

---

[9] Plaintiff's appraiser found a market for the subject property at an alternate use; however, the court has concluded that the alternate use was not the subject's highest and best use as of January 1, 2018.

[10] Defendant concluded that the subject property was "special purpose property."  The *Appraisal of Real Estate* gives some examples of special purpose structures: "houses of worship, theaters, greenhouses, schools, rail and transportation facilities, sports arenas, [and] other specially designed and constructed buildings."  Appraisal Institute, 269 (14th Ed 2013).  It states that "[t]he cost approach may be more applicable to new and special-purpose properties * * *."  *Id.* at 45.  As discussed above, special purpose property may be a category of property for which no immediate market value exists under OAR 150-308-0240(3).  The court has found that the subject property had no immediate market as of January 1, 2018, and determined that "just compensation" measured by the cost approach is the appropriate standard.  A further finding whether the subject was special purpose adds nothing to the analysis.

*Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11-12 (2001) (explaining that real market value "is the value based on market on market worth rather than investment expectation or insurance value"). *The Appraisal of Real Estate* recognizes the insurable value of an asset as an "an indication of cost." Appraisal Institute, 65 (14th ed 2013). "The objective of an insurance policy is to return the insured party to the same position occupied prior to the loss. Insurable value may be based on the replacement or reproduction cost of physical items that are subject to loss from hazards." *Id.*

The court finds Biggers' value conclusion based on insurance cost to be a reasonable measurement of just compensation, particularly given the lack of cost evidence available under market-based cost estimators, such as Marshall and Swift. However, the court finds one further adjustment is supported by the evidence: approximately $2 million to retrofit the subject property for code compliance and to allow operation under two additional occupancy categories: business use and assembly/gathering. Those costs appear to be necessary for the subject to operate at its highest and best use by allowing for events and gatherings. As of January 1, 2018, the subject's occupancy permit only allowed for residential use. Indeed, Biggers testified that a buyer on January 1, 2018, would consider changing the occupancy. Adjusting for retrofitting yields a real market value of $6,310,000 as of January 1, 2018.

C.      *Just Compensation Value is Market Value*

Plaintiff questioned whether Defendant's approach to value resulted in the subject property's "use value" rather than its "value in exchange," contrary to ORS 308.205. The taxpayer in *STC Submarine* made similar arguments before the Tax Court:

> "(1) If the property's current use is its highest and best use, any appraisal based on this analysis will reflect use value or investment value;
>
> "(2) finding current use is the highest and best use ignores the reality of 'what

would happen' if plaintiff sold the plant; and

"(3) highest and best use deals with the requirements of the marketplace, not the requirements of a specific user."

13 OTR at 18. The court rejected each of those arguments, finding that taxpayer's "appraiser [had confused] highest and best use analysis with valuation analysis." *Id.* The Oregon Supreme Court affirmed, explaining that "[t]he building's special features, designed to accommodate [its highest and best use], are part of the property's value-in-exchange, because they increase the amount at which the property would change hands in the marketplace." 320 Or at 595-596.

The Oregon Supreme Court has recently confirmed "that the just compensation standard in ORS 308.205(2)(c) is not use value; it is still market value." *Ellison v. Dept. of Rev.*, 362 Or 148, 153, 404 P3d 933 (2017) (citing *Truitt Bros. v. Dept. of Rev.*, 10 OTR 111, 113-15 (1985), *aff'd on other grounds* 302 Or 603 (1987). "The department's rule implementing ORS 308.205(2)(c), the 'especial property' rule, comports with that understanding. It states that, if comparable sales are not available for a property, then 'real market value' will be determined using only the cost approach and/or the income approach." *Id.* at 154.[11] Accordingly, the court's real market value conclusion of $6,310,000 represents market value under ORS 308.205.

## III. CONCLUSION

Upon careful consideration, the court concludes that the subject property's 2018-19 real market value was $6,310,000, with $2,310,000 allocated to the land. Now, therefore,

/ / /

/ / /

/ / /

---

[11] The department has since revised its rule to refer to "special purpose property" rather than "especial property." *See* OAR 150-308-0240(3).

IT IS THE DECISION OF THIS COURT that the 2018-19 real market value of property identified as Account R171366 was $6,310,000, with $2,310,000 allocated to the land.

_____

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed.  TCR-MD 19 B.*

*Some appeal deadlines were extended in response to the Covid-19 emergency. Additional information is available at <u>https://www.courts.oregon.gov/courts/tax</u>*

*This document was signed by Presiding Magistrate Allison R. Boomer and entered on July 23, 2021.*